## Commonwealth, Appellant, *v.* Barnett.

*Constitutional law—Governor—Veto power.*

The governor is an integral part of the lawmaking power of the state. No bill can become a law without first being submitted to him for his approval or disapproval. His disapproval, commonly known as a veto, is essentially a legislative act.

*Constitutional law—Veto of items in appropriation bill—Public schools.*

In article 4, section 16 of the constitution of Pennsylvania which says "the governor shall have power to disapprove of any item or items of any

199　　161
19 SC 596

199
22 SC 617

199　　161
25 SC 600

199　　161
e210　　378

199　　161
137SC 451

bill making appropriations of money embracing distinct items, and the part or parts of the bill approved shall be the law, and the item or items of appropriation disapproved shall be void," the words " item " and " part " are used interchangeably in the same sense.

The governor has the power of veto over each subject and each amount in an appropriation bill.

The mandate of the constitution in section 1 of article 10, that the legislature " shall appropriate at least $1,000,000, each year " for the support of public schools does not prevent the governor from exercising his veto power over appropriation bills for the public schools.

Where the executive practice of vetoing parts of appropriation bills has been frequent and acquiesced in without objection for a number of years, such practice should be very clearly shown to be unconstitutional to justify the courts in declaring against it.

Where a bill contains an appropriation of $11,000,000, for the support of the public schools, the governor may approve the appropriation to the extent of $10,000,000, and disapprove of $1,000,000, thereof.

*Mandamus—State officers—Jurisdiction—Consent.*

The rule that consent cannot give jurisdiction does not apply where the objection is merely a personal privilege or exemption which may be waived. Therefore the court of common pleas of any county in the state may have jurisdiction in mandamus proceedings against state officers, if such officers waive their privilege of exemption, and consent to the jurisdiction of the court.    MESTREZAT, J., dissents.

Argued March 11, 1901.    Appeal, No. 69, Jan. T., 1901, by plaintiff, from order of C. P. Centre Co., Jan. T., 1901, No. 121, refusing writ of peremptory mandamus in case of Commonwealth ex rel. John P. Elkin, Attorney General, for use of the School District of Patton Township, v. James E. Barnett, State Treasurer of the Commonwealth.    Before McCOLLUM, C. J., MITCHELL, FELL, BROWN and MESTREZAT, JJ.    Affirmed.

Petition for peremptory mandamus.

LOVE, P. J., stated the facts to be as follows:

This is an application for a peremptory writ of mandamus upon James E. Barnett, state treasurer, to compel him to pay to the school district of Patton township, its proportionate share of the money appropriated by the act of May 13, 1899, for the support of the public schools of the commonwealth for two years, commencing June 1, 1899, upon the basis of the whole appropriation named in the bill, namely $11,000,000, an alternative writ having been granted and issued and service waived.

The petition of the plaintiff sets forth that, on May 13, 1899, the governor approved the general appropriation act for that session, with such exceptions as are therein designated. The 8th section of said bill contains the appropriation for the support of the public schools and is as follows: " For the support of the public schools of this Commonwealth for the two years commencing on the first day of June, one thousand eight hundred and ninety-nine, the sum of eleven million dollars to be paid on warrants of the Superintendent of Public Instruction in favor of the several school districts of the Commonwealth : Provided, That the city of Philadelphia shall be entitled to a proper portion of this appropriation, and out of the amount received by the city of Philadelphia there shall be paid the sum of three thousand dollars to the teachers' institute of said city: the sum of three thousand dollars to the Philadelphia School of Design for Women, for their corporate purposes, and the sum of ten thousand dollars to the Teachers' Annuity and Aid Association of said city; Provided further, That warrants for the above and all other unpaid appropriations for common school purposes shall be issued in amounts designated by the State Treasurer, and whenever he shall notify the Superintendent of Public Instruction, in writing, that there are sufficient funds in the State Treasury to pay the same."

The governor approved the appropriation to the extent of $10,000,000 and disapproved of $1,000,000 thereof. The said school district of Patton township, believing that it is entitled to its proportionate share of the $1,000,000, disapproved by the governor, applied to the state treasurer to have him notify the superintendent of public instruction that there were sufficient funds in the treasury to pay the amount claimed by them under said appropriation. The state treasurer declined to do so on the ground that, the governor having disapproved $1,000,000 of the total appropriation, there was no warrant in law authorizing the payment of the same. The said school district had complied with the provisions of the school laws, so that it was entitled to receive the appropriation. The plaintiff school district presented its petition to the attorney general of the commonwealth, asking leave to use the name of the commonwealth in this proceeding for mandamus and that it might be instituted in the court of common pleas of Centre county. It was granted

and the state treasurer notified of the presentation of the application and he consented that the proceedings should be had before the said court of Centre county. The answer filed admits the material facts set forth in the petition.

An agreement was filed in the case that the cause should be heard on bill and answer and that all questions as to the jurisdiction or other technical defenses be waived.

The veto message was as follows :

The item in section 8 which provides as follows :

" For the support of the public schools of the Commonwealth for the two years commencing on the first day of June, one thousand eight hundred and ninety-nine, the sum of eleven million dollars, to be paid on warrants of the Superintendent of Public Instruction in favor of the several school districts of the Commonwealth."

This item makes an appropriation of $5,500,000 annually for the support of the public schools of the commonwealth. The constitution of 1874 provides that not less than $1,000,000 annually shall be appropriated for the support of the public schools of the state. The minimum amount fixed by the new constitution was the maximum of legislative generosity from 1874 down to and including 1887 ; in other words, the legislature, for a period of thirteen years after the adoption of the new constitution, appropriated to the common schools the sum of $1,000,000 annually. Prior to 1874 the annual appropriation to the common schools was very much less than the minimum amount fixed in the constitution. In the early days of our system of popular education the common schools were supported almost entirely by local taxation. It was the thought of the early advocates of the public school system that the schools should be supported by the districts in which they were located, and that the people would have greater interest in them if taxed for that purpose. As the great business and material interests of the state developed it was deemed advantageous to the school system to make more liberal appropriations out of the state revenues.

In 1887 an agitation was started that resulted in increasing the annual appropriation to $1,500,000, and for the two years following the public schools of the state received that amount each year. In 1889 the legislature increased the appropriation

to $2,000,000 annually, and this was the amount of aid extended by the state to the public schools for the two years following that session. Being so successful in having the appropriations for this purpose increased, the friends of our common schools continued the agitation during the session of 1891, with the result of increasing the annual amount set apart for school purposes to the princely sum of $5,000,000. This is a larger amount than is appropriated by any other state in our great country for the support of common schools, and it was very generally supposed that no further attempt to increase it would be made. In 1893, however, a bill was introduced into the legislature which authorized and required directors to furnish free text-books to the pupils in our common schools. At that time a very large number of the districts throughout the state did not provide free text-books for the pupils. The introduction of free text-books necessarily involved the expenditure of large sums of money, and the friends of this measure succeeded in securing an additional $500,000 for this purpose. Following these precedents each succeeding legislature has appropriated $5,500,000 annually for the support of the common schools.

It must not be forgotten in this connection that the appropriation of $5,500,000 does not include the appropriations made for the maintenance and support of our orphan schools, normal schools, the expenses incident to the support of the department of public instruction, the payment of the salaries of county superintendents, and the appropriations made from time to time to other worthy educational institutions. Adding the appropriations made for the purposes last enumerated to the annual appropriation for the support of the common schools, we find that more than $6,000,000 are paid out of the state treasury each year in support of the cause of education. When we take into consideration the fact that the net revenues of the state amount to little more than $11,000,000 each year, it will be readily seen how generous the state has been in dealing with the school question.

These large and magnificent appropriations to the common schools have gone on from year to year until our treasury is left in a condition of financial embarrassment and we now confronted with the practical question whether or not we can continue to make these appropriations without seriously affecting

the credit of the commonwealth. I am proud of our common school system and in hearty sympathy with every movement that has for its purpose the betterment of our schools. If a large deficit did not already exist in our treasury on account of these appropriations, and if the anticipated revenues of the state would justify their continuance, I should most cheerfully give my approval to this section of the general appropriation bill. I cordially commend the intelligent purpose and patriotic devotion of our citizens to the common schools of the state, but every honest man must concede that it is impossible for the state to give away more money than it receives, no matter how worthy the purpose for which the money is expended. It is absolutely necessary to reduce the appropriations made by the legislature, and it has seemed to me that, since free text-books have already been provided and paid for out of the general appropriations made since 1893, the annual appropriations could be reduced $500,000 a year without doing any injustice to the schools.

In my inaugural address I called the attention of the legislature to the financial condition of the commonwealth, and stated that there was an actual deficit of between $3,000,000 and $4,000,000 on account of unpaid appropriations, and suggested that the legislature should either cut down the appropriations or increase the revenues. I urged this both privately and publicly upon different occasions, but the legislature has adjourned without providing any additional revenue, except possibly an increase estimated at $200,000 per annum after the first year under the new mercantile tax law. The appropriations made will amount to as much as, if not more than, the estimated revenues of the next two years. On June 1—but a few weeks hence—the whole appropriation of $5,500,000 for the year ending at that time will be due, no part of which has as yet been paid. At that time there will not be $1,000,000 in the treasury to meet this obligation. In view of this financial condition it seems to me unwise to accumulate one appropriation upon another when there are no funds with which to pay them. I have carefully examined the general appropriation bill, as well as other appropriation bills, and have in every instance withheld my approval from items where I felt justified in so doing. In this way I have reduced the appropriations made

by the legislature and withheld my approval of bills amounting in round numbers to $500,000. It is my earnest desire to pay the obligations of the state which have been heretofore made, and which it is honorably bound to pay, to relieve the present embarrassment of the treasury, and preserve the credit of the state. No fair-minded and impartial citizen will justify me in approving appropriation bills in excess of the unpaid appropriations made by prior legislatures and the estimated revenues of the state for the two fiscal years next following. During the four years for which the people have honored me with the executive office I hope, by economy and care, even in the absence of additional revenue, to see these unpaid appropriations liquidated and the state placed upon a sound financial basis. A state, like an individual, cannot continue to pay out year by year more money than it receives and remain in a solvent condition. My purpose is to pay all appropriations made by the present legislature which receive executive approval and liquidate at least $1,500,000 of the obligations remaining from former legislatures during the next two years. In order to do this I am compelled to reduce the appropriation to the common schools $500,000 a year, amounting to $1,000,000 in two years, which, added to the $500,000 obtained by reducing other appropriations of the legislature of 1899, will enable the auditor general and state treasurer to reduce what would be called the floating debt $1,500,000 during the next two years. In my judgment the state should pay its pre-existing debts, incurred under the sanction and authority of law, before it assumes new burdens which it is impossible to pay.

The authority of the governor to disapprove part of an item is doubted, but several of my predecessors in office have established precedents by withholding their approval from part of an item and approving other parts of the same item. Following these precedents, and believing that the authority which confers the right to approve the whole of an item necessarily includes the power to approve part of the same item, I, therefore, approve of so much of this item which appropriates $5,000,000 annually, making $10,000,000 for the two years beginning June 1, 1899, and withhold my approval from $500,000 annually, making $1,000,000 for the two school years beginning June 1, 1899.

*Error assigned* was the decree of the court.

*W. E. Gray*, for appellant.—An item is a separate particular, or a separate entry in an account or schedule. The general appropriation act of 1899 is made up of a schedule of about 260 separate and distinct items, any one of which the governor might veto, except the school appropriation, which is protected by article 10, section 1, of the constitution to the extent of $1,000,000 per year from executive disapproval, and by the provisions of section 16, article 4, the item or items disapproved shall be void, etc., and the part or parts of the bill approved shall be the law: Porter v. Hughes, 32 Pac. Repr. 165; State v. Holder, 76 Miss. 158.

Section 16, article 4, only applies to appropriation bills containing more than one item. If the bill contains but one item the authority of the governor to veto is exercised under section 15, article 4 of the constitution. If the appropriation bill contains more than a single item, and the governor is satisfied to approve some items and veto other items, he approves the bill except as to the item or items he vetoes or disapproves, and does this under the authority conferred by section 16, article 4, and the part or parts of the bill approved shall be the law, and the item or items disapproved shall be void, unless repassed over his veto.

*C. Tyson Kratz*, for the school directors of Worcester township and twenty-three other districts in Montgomery County. —The court had no jurisdiction: Com. v. Wickersham, 90 Pa. 311.

*John P. Elkin*, attorney general, with him *Frederic W. Fleitz*, deputy attorney general.—The governor is equally bound by all the provisions of the constitution. It is his duty to enforce every provision of the constitution that bears upon the particular question calling for the exercise of his official judgment and discretion. In passing upon an appropriation made for the support and maintenance of the public schools, it is respectfully submitted he should keep in mind four provisions of the constitution, all of which bear upon the question; Section 15 of article 4; section 1, article 10; section 4, article 9; section 16, article 4.

It is contended by those who oppose the right of the governor to approve part of an item and disapprove part of the same item, that it is conferring upon the executive legislative power, and that it is not the intention of our constitution and laws to make the governor any part of the legislative machinery in the enactment of law. The history of the veto power, as exercised in the remote past, and carried down, in a limited and modified form to the present, will not support the contention of those who take this view: Mason's Veto Power, sec. 1; 1 Bryce's American Commonwealth, p. 220.

The object of that section which gives the governor the right to approve part of an item in the general appropriation bill and disapprove of other parts, was to enable him to exercise discretion and discrimination by disapproving of a measure in part without being obliged to strike down the whole.

The power conferred by the constitution to approve any item or items in an appropriation bill, and disapprove of other items, necessarily includes the power to approve or disapprove of part of the same item; hence it follows that the part or parts of the bill approved became law and the part or parts disapproved will not have the force of law. Since the governor approved the appropriation only to the extent of $10,000,000 for the two years in question, it therefore follows that the state treasurer has the right to make a distribution only upon that basis.

The contemporaneous construction of the executive and other branches of the state government has weight with the court in passing upon questions of this character. Such constructions are not final but they are at least persuasive when brought to the attention of the court: Endlich on Interpretation of Statutes, sec. 527; Cooley on Constitutional Limitations, p. 82.

OPINION BY MR. JUSTICE MITCHELL, April 22, 1901:

The governor is an integral part of the law-making power of the state. Section 15 of article 4 of the constitution provides that " every bill which shall have passed both houses shall be presented to the governor; if he approve he shall sign it, but if he shall not approve he shall return it with his objections to the house in which it shall have originated," etc., and no bill, therefore, can become a law without first being submitted to the governor for his approval or disapproval. His disapproval,

commonly known as a veto, is essentially a legislative act. The fact that the governor is limited to negation or concurrence and cannot affirmatively initiate or amend legislation, does not take away the legislative character of his act, any more than the want of power in the senate of the United States to originate revenue bills changes its standing as a co-ordinate branch of congress.

In this view all the authorities concur. The veto power of the president " is not executive in its nature, but essentially legislative. It makes him in effect a branch of congress though only to a limited and qualified extent : " Black on Constitutional Law, sec. 67.

The president " thus became a third branch of the legislature whose approval was ordinarily requisite to the success of any measure proposed by the other two : " Hare, Lectures on Constitutional Law, p. 212.

" It appears as a matter of historical development as well as of theory, that the veto is a legislative power : " Edward Campbell Mason, The Veto Power, sec. 100.

" The power to veto legislation which is conferred upon the president, makes him in effect a third branch of the legislature. The power is legislative, not executive, and the questions presented to his mind are precisely the same as those the two houses of congress must determine in passing a bill : whether the proposed law is necessary or expedient, whether it is constitutional, whether it is so framed as to accomplish its intent, and so on, are questions transferred from the two houses to the president with the bill itself : " Cooley, General Principles of Constitutional Law, ch. 3, p. 49. (2d ed. 1891).

Being thus settled to be legislative in character, the presumption is that within its limited sphere of negation the power applies to every branch and subject of the bill to which the legislative powers of the two houses apply. And the history of the power as at present existing in the constitution of this state confirms the presumption.

The veto power is a survival of the lawmaking authority vested in the king as a constituent if not a controlling third body of the parliament, in which he might and not unfrequently did sit in person. With the growth of free ideas and institutions and the aggressive spirit of the popular branch of the

parliament in the affairs of government, it lost its vitality as a real power in England, though it still exists in theory. But in the colonies it not only existed but was an active power, absolute in character, and so constantly exercised that as Professor Mason has aptly called attention to, the declaration of independence set forth first among the grievances of the colonies, " He has refused his assent to laws most wholesome and necessary for the public good: " Mason's Veto Power, sec. 7. The most important chapter in the legislative history of the province of Pennsylvania will be found in the long and obstinate contest between the general assembly and the proprietaries and the crown (acting through the privy council and the board of trade) over the refusal of assent to the acts of the assembly.

From the colonies the power passed with various limitations into nearly all the American constitutions, state and national. Originally intended mainly as a means of self-protection by the executive against the encroachments of the legislative branch, it has steadily grown in favor with the increasing multitude and complexity of modern laws, as a check upon hasty and inconsiderate as well as unconstitutional legislation. The executive is usually better informed on the exact condition of the public affairs than the individual members of the legislature, and he acts under the concentrated responsibility of a single officer. That vetoes are usually wise and convincing is shown by the small proportion which has been overridden by the second passage of the disapproved act. Of 433 acts disapproved by the presidents of the United States down to 1889, only twenty-nine were repassed over the veto : Mason's Veto Power, sec. 116.

As inherited from the colonies and adopted in the early constitutions, the veto power was confined to approval or disapproval of the entire bill as presented, and this in experience was found to be inadequate to the accomplishment of its full purpose. The legislature in framing and passing a bill had full control over every subject and every provision that it contained, and the governor as a co-ordinate branch of the law-making power, was entitled to at least a negative of the same extent. But by joining a number of different subjects in one bill, the governor was put under compulsion to accept some enactments that he could not approve, or to defeat the whole,

including others that he thought desirable or even necessary. Such bills, popularly called "omnibus" bills, became a crying evil, not only from the confusion and distraction of the legislative mind by the jumbling together of incongruous subjects, but still more by the facility'they afforded to corrupt combinations of minorities with different interests to force the passage of bills with provisions which could never succeed if they stood on their separate merits. So common was this practice that it got a popular name, universally understood as log rolling. A still more objectionable practice grew up of putting what is known as a "rider," that is a new and unrelated enactment or provision on the appropriation bills, and thus coercing the executive to approve obnoxious legislation or bring the wheels of the government to a stop for want of funds.

These were some of the evils which the later changes in the constitution were intended to remedy. Omnibus bills were done away with by the amendment of 1864 that no bill shall contain more than one subject which shall be clearly expressed in the title. But this amendment excepted appropriation bills, and as to them the evil still remained. The convenience if not the necessity of permitting a general appropriation bill containing items so diverse as to be fairly within the description of different subjects was patent. The present constitution meets this difficulty first, by including all bills in the prohibition of containing more than one subject except "general appropriation bills" (article 3, section 3); secondly by the provision that "the general appropriation bill shall embrace nothing but appropriations for the ordinary expenses of the executive, legislative and judicial departments of the commonwealth, interest on the public debt, and for public schools; all other appropriations shall be made by separate bills each embracing but one subject" (article 3, section 15); and thirdly, by the grant to the governor of "power to disapprove of any item or items of any bill making appropriations of money, embracing distinct items, and the part or parts of the bill approved shall be the law, and the item or items of appropriation disapproved shall be void, unless repassed according to the rules and limitations prescribed for the passage of other bills over the executive veto:" Article 4, section 16.

The purpose of these provisions is clear beyond question.

They are a distinct recognition of the legislative character of
the governor's part in the passage of the bills, and an equally
distinct effort to increase the power and scope of his veto. By
section 15 of the same article a bill can only be passed over a
veto by a vote of two thirds of all the members elected to each
house, instead of two thirds of a quorum voting as under the
constitution of 1838. " The power," says Mr. Buckalew, " has
been tried and not found wanting ; it has won popular confi-
dence in a high degree, and is now justly regarded as an indis-
pensable feature of American constitutions. In the Convention
of 1873 no voice was raised in opposition to it, or for imposing
any new and material limitations upon its exercise in future : "
Notes on the Constitution, p. 117. Section 16 of article 4 above
quoted with which we are immediately concerned is a clear ex-
pression of intent to give the governor to the extent of refusing
approval, the same control over the particulars of a general ap-
propriation bill that each house of the legislature had.

The argument on both sides has included much discussion of
the exact definition of the word " item." But we have no occa-
sion to consider minutely the language of the dictionaries in this
connection. The general idea conveyed by the word is well
understood and with that in our minds the precise meaning in
the constitution is shown by the context to be the particulars,
the details, the distinct and severable parts of the appropria-
tion. The language is " the governor shall have power to dis-
approve of any item or items . . . . and the part or parts of
the bill approved shall be the law, and the item or items of the
appropriation disapproved shall be void," etc. It is clear that
" item " and " part " are here used interchangeably in the same
sense. If any special or different meaning was attached to the
word " item " the natural mode of expression would have been
to use that word throughout the section, but for the sake of
euphony and to avoid the repetition of the same words three
times in the same sentence, the draughtsman used the word
" parts " as an evident synonym. This is also apparent from
the plain purpose of the section. In ordinary bills the single
subject is a unit which admits of approval or disapproval as a
whole, without serious inconvenience, even though some of the
details may not be acceptable. But every appropriation, though
it be for a single purpose, necessarily presents two considera-

tions almost equally material, namely, the subject and the amount. The subject may be approved on its merits, and yet the amount disapproved as out of proportion to the require-ments of the case, or as beyond the prudent use of the state's income. The legislature had full control of the appropriation in both its aspects and the plain intent of this section was to give the governor the same control as to disapproval, over each. subject and each amount. A contrary construction would de-stroy the usefulness of the constitutional provision. If the legislature by putting purpose, subject and amount inseparably together and calling them an item, can coerce the governor to approve the whole or none, then the old evil is revived which this section was intended to destroy. No better illustration is needed than is afforded by the case in hand. Section 8 of the act of May 13, 1899, appropriated for the public schools $11,000,000 for the two years of 1899 and 1900, provided that "out of the amount received by the city of Philadelphia there shall be paid the sum of three thousand dollars to the Teachers' Institute of said city; the sum of three thousand dollars to the Philadelphia School of Design for Women for their corporate purposes, and the sum of ten thousand dollars to the Teachers' Annuity and Aid Association of said city," etc. In this por-tion of the section alone there are included four distinct and severable parts, each of which is an "item" within the pur-pose, intent and meaning of the constitutional provision under consideration, namely the public schools, the Teachers' Institute, the School of Design for Women and the Teachers' Annuity and Aid Association. The public schools being objects of ap-propriation by the express mandate of the constitution, the only question before the governor as to them was the amount, but the other three items presented the double consideration of the beneficiary and the amount. On each of these matters, quoting again the language of Judge COOLEY, supra, "the questions presented to the mind of the executive are precisely the same as those the two houses (of Congress) must determine in pass-ing a bill; whether the proposed law is necessary or expedient, whether it is constitutional, whether it is so framed as to ac-complish its intent, and so on, are questions transferred from the two houses to the president (executive) with the bill itself." On each of these questions therefore the governor was entitled

to exercise his legislative judgment separately, and to approve or disapprove accordingly. Suppose for illustration that instead of the beneficiaries being worthy public institutions the city of Philadelphia had been directed to pay part of its appropriation to a sectarian school in violation of the express prohibition in section 18 of article 3. It would have been the governor's imperative duty to veto such appropriation, and the legislature could not coerce him by putting him to the alternative of approving it or disapproving the entire section with its constitutional grant to the public schools. Or suppose on the other hand the appropriation had been to one of the institutions named of $1,000,000 or more. The governor might in his legislative judgment have approved the beneficiary as a proper object of state aid, but have found the amount excessive. He was entitled to approve as to the object, and to disapprove as to a portion of the amount. That is what he has done in the present case, and his action was within his constitutional powers.

Both sides have sought to derive confirmation of their views from the express mandate of the constitution in section 1 of article 10, that the legislature " shall appropriate at least one million dollars each year" for the support of public schools. This, the appellants claim, prevents the governor from exercising his veto power at all against appropriations for the public schools. But this argument entirely ignores the constitutional requirement that " every bill" shall be submitted for the governor's approval. The constitution makes no exception of school bills or any other, and such exception would permit easy and clear violation of the prohibition in section 4 of article 9, against the creation of a state debt exceeding $1,000,000 in the aggregate at any one time, to supply deficiencies in revenue. Suppose the legislature should appropriate a sum for school purposes exceeding by more than $1,000,000 the entire revenue of the state. It would be the governor's duty to veto it to prevent the creation of a prohibited debt. And even if the appropriation for schools was only the constitutional $1,000,000, yet if that would increase an already existing debt from deficiency of revenue beyond the prohibited limit, there would at once be an inevitable conflict between two express provisions of the constitution, and it would become the

governor's duty to exercise his legislative judgment which was of the lesser importance and should give way. The clear result, therefore, is that appropriations for school purposes are not excepted in any case from the requirement of submission to the governor for his approval.

Moreover, the appellants have entirely overlooked or misconceived the effect of a partial veto such as was given in the present case. If the disapproval of part and the approval of the rest were not valid acts, then there was no appropriation at all, and the money already received by the schools was illegally paid. For there was no executive approval of an appropriation of $11,000,000. There are but three ways in which a bill can become law in this state, passage by the legislature, and approval by the governor, passage by the legislature, disapproval by the governor, and passage again in the mode prescribed by the constitution, or passage by the legislature and failure of the governor to return it with his objections within the required time. The appropriation of $11,000,000 claimed in the present case, never became law in any of these three ways and there is no other.

The question in this case is presented for the first time in this state, and is very bare of authorities elsewhere. The diligence of counsel has found only two cases and neither of them is at all close. Porter v. Hughes, 32 Pac. Repr. 165, arose in Arizona where the governor has no power to veto single items of a bill, and the question therefore was the same as it would have been here under the old constitution. In Mississippi the governor has power to veto parts of appropriations. Under this power the governor approved the whole appropriation, but vetoed certain conditions appended to it. In State v. Holder, 76 Miss. 158, it was held by a divided court that such veto was not within his authority. Neither of these cases affords us any assistance.

But though the question has not been presented before for judicial determination, the practice in this state is not new. The respondent has set out in his answer a number of examples of vetoes since the present constitution went into force, by Governor Pattison in both his terms, Governor Beaver and Governor Hastings, of parts of appropriation bills. Appellant has argued at some length that none of these instances was ex-

actly like the present, and as to the details that much may be conceded. But they all rest on the same principle, the right of the governor in the exercise of his independent legislative judgment to approve an appropriation in part, by reducing the amount fixed by the legislature. As to that principle the executive practice must be considered as settled. While the executive interpretation of his own powers is not binding on the judiciary, it has always been considered as persuasive and entitled to great respect. And where as in this instance the practice has been frequent and acquiesced in without objection for a number of years, it should be very clearly shown to be unconstitutional to justify the courts in declaring against it.

The parties to this case with a commendable desire to obtain a speedy decision have set forth all the necessary facts in the petition and answer, and agreed that all technical matters shall be waived. On account however of the importance of the public interest involved, we have allowed counsel for other school districts to intervene and present additional arguments against the decision of the court below. One of such intervening parties has challenged the jurisdiction of the common pleas of Centre county to entertain the case, and thereby that of this court to hear it on appeal. The right of a party admitted by an act of grace to be heard as amicus curiæ, thus to attempt to set aside the formal agreement of the legal parties is not conceded, but as the question of jurisdiction is always open, it is proper that it should receive consideration even when brought forward in this irregular way.

The objection made is that a court of common pleas has no power to issue a writ of mandamus to a state officer. Objections to jurisdiction are of two classes between which there is a clear and well settled distinction, first those relating to the authority of the court over the subject-matter, and secondly those relating to its authority over parties. Objections of the first class cannot be waived nor jurisdiction obtained by acquiescence. Thus if the writ of mandamus had issued from the quarter sessions or the orphans' court, the proceeding would be void ab initio for defect of authority in the court to issue such process and determine such controversies. It is of this class that it is commonly said that consent cannot give jurisdiction. But in the second class the rule is different. The

party exempt from jurisdiction may waive his personal privilege, and if he does so the jurisdiction of the court is complete. Thus if the defendant is not duly served with process, or is a nonresident beyond the reach of process, or if served while temporarily exempt as a juror or party or witness, or member of the legislature, the proceeding as to him will be void or voidable on showing the facts. But if he waives his exemption and appears voluntarily, the jurisdiction of the court over him is thereafter beyond question.

By the Act of May 22, 1722, secs. 11 and 13, 1 Smith's Laws, 139, the Supreme Court was authorized to issue "all remedial and other writs and process . . . . as fully and amply as the justices of the court of king's bench, common pleas and exchequer at Westminster, or any of them, may or can do." Under this statute the Supreme Court issued writs of mandamus as a common-law writ, and preserved the common-law practice in all proceedings thereon.

By the Act of June 14, 1836, P. L. 626, sec. 18, the courts of common pleas within their respective counties were invested with "like power with the Supreme Court to issue writs of mandamus to all officers and magistrates elected or appointed in or for the respective county, or in or for any township, district or place within such county, and to all corporations being or having their chief place of business within such county." The jurisdiction thus granted to the common pleas was a common-law jurisdiction to be exercised according to common-law practice. But state officers not being among the subjects specifically enumerated in the grant, it is argued that no such writ can be issued to them. So far as it is a compulsory process this must be admitted, but it does not follow that it may not issue or become effective by consent. A writ against a nonresident as a compulsory writ is inoperative, not because the court has no authority to issue it, but because the person against whom it is issued is exempt from its operation. And the objection to the writ against a state officer belongs to the same class. The writ of mandamus itself is one which the court has full power to issue, but a state officer is exempt from its operation. This is a personal or official exemption, the manifest purpose of which was to protect a state officer from being taken away or interfered with in his official duties at the seat of government,

to answer the local courts throughout the state.    He is exempt for the convenience of the public business.    But if the convenience of getting a decision on a question of public importance outweighs the inconvenience of going to a local court for it, there is nothing in the statute or in the public policy on which it is founded, to prevent the officer from so doing, and of such convenience the officer himself must be the judge. We are of the opinion that the objection now made relates not to the authority of the court over the subject-matter, but only to the privilege, personal or official, of the defendant.    It was, therefore, an objection that could be waived, and having been expressly waived in the court below, the case is properly here for final adjudication.

In Com. v. Wickersham, 90 Pa. 311, the state officer insisted on his exemption, and all that the case decided was that he could not be compelled to submit to the jurisdiction.    There is nothing in any of the other cases that bears materially on the present question.

Judgment affirmed.


MR. JUSTICE MESTREZAT, dissenting:

I do not agree with the conclusions reached by the majority of the court, and hence dissent from the judgment about to be entered.

There are two questions presented on this record for consideration: 1. The jurisdiction of the court below, and incidentally the right and the duty of this court to consider and determine the question of its own motion or at the suggestion of an amicus curiæ.    2. The authority of the governor of Pennsylvania to veto a part of an item of an appropriation where that appropriation consists of one item and one sum.

We are met at the very threshold of this case by the question of jurisdiction.    It was suggested by the attorney general in his argument in behalf of the state treasurer that the question should not be considered by this court as it was not raised by either of the parties to this contention.    It appears on the record by an agreement of counsel for the parties "that all questions of jurisdiction and other technical defenses should be waived."    It is therefore necessary to determine the duty of this court in this respect, and it is the first matter for consideration.

This was a petition by the attorney general of the commonwealth presented to the court of common pleas of Centre county, praying the court to issue a writ of mandamus against the state treasurer commanding him to notify the superintendent of public instruction in writing that there were sufficient funds in the state treasury to pay the school district of Patton township, said county, its pro-rata share of the general appropriation upon whatever basis the court might determine the district was entitled to receive its proportionate share, and requiring the state treasurer to designate the amount which said district is entitled to receive under the general appropriation act, and to so inform the superintendent of public instruction. An answer was filed by the state treasurer, the case heard by the court below and the writ was refused and the petition was dismissed.

The application, therefore, was for a mandamus at the relation of the attorney general for the use of the school district of Patton township against the state treasurer of the commonwealth. As I shall hereafter attempt to show, the court below had no jurisdiction of the subject-matter. Being without jurisdiction, its action was not only irregular but it was absolutely void : Philips's Appeal, 34 Pa. 489 ; Miltimore v. Miltimore, 40 Pa. 155 ; Voorhees v. Bank of the United States, 10 Pet. 449 ; Borden v. Fitch, 15 Johns. (N. Y.) 121. The judgments and orders of a court without jurisdiction are mere nullities, and may not only be set aside at any time by the court in which they are rendered, but they may be declared to be void by every court in which they are presented : 17 Am. & Eng. Ency. of Law (2d ed.), 1046. In Miltimore v. Miltimore, supra, THOMPSON, J., speaking for the court, says : " When the jurisdiction does not exist, and usurpation takes its place, then all the acts of the tribunal are void ' and of none effect ' and may be so treated in any collateral proceeding. Where there is no jurisdiction there is no authority to pronounce judgment, and consequently a judgment so entered is so but in form and similitude, and has no substance, force or authority." The powers conferred upon a court are those given it by the constitution, by the common law or by statute. When its authority is not supported from either source, it is the duty of the appellate court to so declare. It is well settled in this state

that want of jurisdiction in a court may be taken at any time: Stearly's Appeal, 3 Grant, 270; Musselman's Appeal, 101 Pa. 165. It is never too late to attack a judgment for want of jurisdiction: Fowler v. Eddy, 110 Pa. 120. The reason for this is that the action of a court wanting jurisdiction is without effect and wholly void. The judgment of the court below being void, it is the duty of this court upon its own motion or on the suggestion of an amicus curiæ to determine the question. " It is not matter of an adversary nature," says Mr. Justice FOSTER in Olmstead's Appeal, 43 Conn. 114, " to be regarded with disfavor, like a dilatory plea. It is for the interest of the court, and must be the desire of the court, to know as early as possible that it has no jurisdiction, if such be the fact. If the information does not come early, it must not be rejected if it comes late. Whenever and however it comes, it should be received as the suggestion of an amicus curiæ, and the proper legal action promptly taken. . . . When once before that tribunal (Superior Court), no matter by what door they gain admission, the jurisdiction of the court must always be a legitimate subject of inquiry. The suitors can come in by no door which shuts off inquiry into the jurisdiction." In Lansing v. Chicago, etc., Railway Co., 85 Iowa, 215, Mr. Justice ROTHROCK, speaking for the court, says: " But it is a familiar rule of practice that the jurisdiction of a court may be challenged at any time in the progress of the cause, and, if not raised by the parties, courts will take notice of questions of jurisdiction. . . . The impropriety of determining any question without jurisdiction is manifest." Mr. Justice DORSEY, in Berrett v. Oliver, 7 Gill. & J. 191, delivering the opinion of the court of appeals of Maryland, says: " Against the influence of such a defect (want of jurisdiction), you cannot shut your eyes, whether the defendant rely upon it as a defense, in his answer, by plea, or on demurrer, or not. It is a matter of law of which the court must judicially take notice. It admonishes them not to proceed in the trial; that they have no jurisdiction over the subject-matter thus illegally attempted to be brought before them."

It therefore appears that it is the duty of this court to take notice of want of jurisdiction in the court below of its own motion or at the suggestion of an amicus curiæ. In this case, other school districts similarly situated as Patton township in

respect to this appropriation were permitted to appear by counsel and present an argument in behalf of the relator. The counsel for these districts has suggested the question of jurisdiction.

Having determined it to be the duty of the court to examine the question of jurisdiction, I will now proceed to consider the first of the two principal questions involved in this controversy, viz: the authority of the court of common pleas of Center county to entertain jurisdiction of the subject-matter of this contest. This incidentally involves also an inquiry into the jurisdiction of the Supreme Court to issue the writ of mandamus.

In this country the courts empowered to exercise jurisdiction by mandamus are generally fixed by the constitutions of the various states or by legislative enactment not inconsistent therewith: High on Extraordinary Legal Remedies, sec. 580. The jurisdiction of the courts of Pennsylvania to issue the writ of mandamus is conferred by constitutional and legislative authority. The Supreme Court was established and its powers conferred by the Act of May 22, 1722, 1 Smith's Laws, 112. The 11th section of the act required the courts to be holden twice in every year at Philadelphia, fixed the number of judges at three and conferred upon them "full power and authority, by virtue of this act, when and as often as there may be occasion, to issue forth writs of habeas corpus, certiorari and writs of error, and all remedial and other writs and process, returnable to the said court, and grantable by the said judges by virtue of their office, in pursuance of the powers and authorities hereby given them." The 13th section of the act conferred criminal and appellate jurisdiction on the judges and then provided that they "generally shall minister justice to all persons, and exercise the jurisdictions and powers hereby granted concerning all and singular the premises according to law, as fully and amply, to all intents and purposes whatsoever as the justices of the courts of king's bench, common pleas and exchequer at Westminster, or any of them, may or can do." The 1st section of the Act of June 16, 1836, P. L. 785, confers appellate jurisdiction on the Supreme Court, and the 7th section provides that "the judges of the Supreme Court shall have full power and authority when and as often as there may be oc-

casion, to issue writs of habeas corpus, writs of certiorari and writs of error, and all remedial and other writs and processes returnable to said court."

Mandamus was a high prerogative writ and in England was issued only out of the court of king's bench. Blackstone (3 Comm. 110) says that the "writ of mandamus is, in general, a command issuing in the king's name from the court of king's bench, and directed to any person, corporation, or inferior court of judicature within the king's dominion, requiring them to do some particular thing therein specified, which appertains to their office and duty, and which the court of king's bench has previously determined, or at least supposes, to be consonant to right and justice." The authority of the king's bench in this respect was conferred upon the Supreme Court of this state : Commonwealth v. Commissioners of Lancaster County, 6 Binn. 5 ; Pennsylvania Railroad Co. v. Canal Commissioners, 21 Pa. 9 ; Commonwealth v. Councils of Pittsburg, 34 Pa. 496 ; In re Sedgeley Avenue, 88 Pa. 509. No inferior tribunal could exercise jurisdiction in such cases. The courts of common pleas of the state were without authority to issue the writ : Commonwealth v. Commissioners, supra. In that case, Mr. Justice BRACKENRIDGE said : "No subordinate court under the judicial system of this state ever had any power to issue a writ of mandamus." Recognizing this lack of jurisdiction in the courts of common pleas and having a desire to remedy it to a certain extent, the legislature passed the Act of June 14, 1836, P. L. 626, the 18th section of which provides as follows : "The several courts of common pleas, the president judge being present, shall, within their respective counties, have the like power with the Supreme Court to issue writs of mandamus to all officers and magistrates, elected or appointed in or for the respective county, or in or for any township, district or place within such county, and to all corporations being or having their chief place of business within such county." The authority of the courts of common pleas to issue writs of mandamus was limited to the cases enumerated in the act. This was expressly so decided in Wolf v. Commonwealth, 64 Pa. 252, and in Commonwealth v. Wickersham, 90 Pa. 311.

It will be observed that the act of 1836, did not confer upon the courts of common pleas the authority to issue a mandamus

to a state official.   Hence this jurisdiction was still confined to the Supreme Court and it alone could exercise the jurisdiction. The act of 1836 continued in force until 1893.   Section 1 of the Act of June 8, 1893, P. L. 345, practically re-enacts the act of 1836, and in addition contains the following clause : " And the court of common pleas of the county in which the seat of government is or may be located shall have the power, and it shall be required, to issue the writ of mandamus to the lieutenant governor, secretary of the commonwealth, attorney general, secretary of internal affairs, superintendent of public instruction, state treasurer, auditor general, insurance commissioner, and commissioners of the sinking fund."   This act, therefore, was the first to confer upon any court of common pleas of the commonwealth jurisdiction to issue the writ of mandamus to a state official.   Until its enactment, no authority was vested in any court of common pleas to issue the writ to a state officer : Commonwealth v. Wickersham, supra.   In that case an application was made to the court of common pleas of Dauphin county in 1879 for a mandamus against the superintendent of public instruction. Judge PEARSON in the court below held that there was no jurisdiction in the common pleas of Dauphin county to issue the writ under the general act of June 14, 1836, or the special act of April 7, 1870, and in discussing the question of jurisdiction under the act of 1836, said : " By the common law the writ of mandamus was looked upon as a high prerogative writ, which could be issued out of the court of king's bench alone, where the king was originally supposed to be sitting in person.   The power to issue it did not exist in any inferior tribunal, and generally it was only allowed to prevent a failure of justice when the relator had no other legal remedy or one attended with great delay.   By an early statute, act of May 22, 1722, the Supreme Court of this state was authorized to administer justice as fully and amply, to all intents and purposes whatsoever, as the justice of the court of king's bench, common pleas and exchequer at Westminster, or any of them, may or can do.   That law continued in force, and the process of that court to run throughout the state to secure justice to all men until the convention for forming a new constitution, in the plenitude of its wisdom, abrogated the power altogether without conferring it on any other tribunal.   The 3d section of the 5th article gives

authority to issue writs of mandamus to all inferior courts, but takes away original jurisdiction in all other cases. See Butler v. Hartranft, Governor of Penna., 27 P. F. Smith, 154. No inconvenience was ever felt from the exercise of the power by the Supreme Court. We never heard of its abuse. The courts of common pleas in the state never were authorized to issue the high prerogative writ of mandamus until it was conferred in a very limited form by the 18th section of the act of June 14, 1836, which declares that they shall, within their respective counties, have the like power with the Supreme Court to issue writs of mandamus to all officers and magistrates elected or appointed in or for the respective county, or in or for any township, district or place within such county, and to all corporations being or having their chief place of business within such county. It is in these cases and over these persons and corporations alone that the courts of common pleas have jurisdiction." The case having been removed to the Supreme Court, that court said : " Upon the question of the jurisdiction of the court of common pleas of Dauphin county to issue a mandamus to a state officer, we adopt the opinion of the learned president of the court below." The court not only approved Judge PEARSON's conclusion, but adopted his opinion as the opinion of this court. It was, therefore, explicitly decided by this court that prior to the act of June 14, 1836, the courts of common pleas of the state were never authorized to issue the writ of mandamus, and that under the act said courts had jurisdiction to issue the writ only in the cases, and to the persons and corporations, therein named. Subsequent to the adoption of the constitution of 1873 and prior to the act of 1893, no court in the state had original jurisdiction to issue a writ of mandamus to a state officer.

I think it is clear that the court of common pleas of Centre county was without authority to issue the writ of mandamus to a state official, and hence it did not have the power to issue the writ to the state treasurer. As we have seen, under the decisions of this court, the courts of common pleas of the state have no general jurisdiction of the subject-matter and that whatever authority they possess was conferred upon them by statute. The counsel for the parties attempted to give jurisdiction to the court of common pleas of Centre county by an

agreement " that all questions of jurisdiction and other techni-
cal defenses shall be waived." It is evident that they doubted
the authority of that court to issue the writ and hence they
sought to confer jurisdiction by consent. This, of course, was
necessarily abortive. As the court had no general jurisdiction
of the subject, it should have occurred to them that they were
powerless to grant jurisdiction of this cause by consent. This
is elementary law and is supported both by reason and authority.
The decisions of this court supporting the principle are numer-
ous, among which may be mentioned: Morrison v. Weaver,
4 S. & R. 190 ; Stoy v. Yost, 12 S. & R. 385 ; Collins v. Collins,
37 Pa. 387 ; Deihm v. Snell, 119 Pa. 316.

Why the attempt to confer jurisdiction on the common pleas
of Centre county was made does not appear in the pleadings
nor in the agreement signed by counsel waiving the question of
jurisdiction. The act of 1893 empowering the court of common
pleas in which the seat of government is situated, to issue the
writ to state officers, like many similar statutes, was intended
to make a certain class of important litigation exclusively cog-
nizable by the court of common pleas exercising jurisdiction in
the district in which the state capital is situated, and to protect
the state officials from the annoyance and inconvenience of be-
ing compelled to respond with the records of their offices to
writs issued in other and remote jurisdictions. The wisdom of
such legislation must be conceded. For the additional duties
imposed upon the judges of that court, extra compensation is
provided in their salaries. As the attorney general is the legal
adviser of the executive department, we must assume that he
was familiar with the statutes enacted specially for the benefit
and convenience of its officials. It is, therefore, not apparent
why he left the jurisdiction of a court, created for these pur-
poses, and consented to a determination of the cause by a court
with no authority, or at least of doubtful authority, to hear and
determine it. If a speedy decision of the question involved was
desired, the most favorable opportunity was presented in the
court of common pleas of Dauphin county, with two judges on
the bench. And this is true regardless of the county where the
question first arose. But it is a fact familiar to every one that
school districts in all parts of the state were demanding their
share of the whole appropriation, and hence there could have

been no difficulty in having a test case presented to the judges of Dauphin county at the pleasure of the attorney general. Nor does the reason appear nor the record disclose why the learned judge of the court of common pleas of Centre county entertained jurisdiction of the cause. He, like the attorney general, is presumed to know that his court was without authority over the subject-matter and that the consent of the parties could not confer jurisdiction upon it.

It is, therefore, clear under the decisions of this court that the court of common pleas of Centre county was without jurisdiction in the case, and that its decree was void. There is no power in this court to review the action of the court of common pleas on the merits of the cause, but we have authority, and it is our duty, to arrest the illegal action of the trial court. The whole proceeding in the trial court, from its inception to the final decree, was coram non judice. We ought, therefore, to direct the court below to do what it should have done of its own motion, viz : dismiss the petition for want of jurisdiction.

The other question for consideration involves the merits of the case, and requires the determination of the right of the executive to veto a part of an appropriation, embracing but a single item, contained in a general appropriation bill. The authority to exercise this power is claimed for the executive under article 4, section 16, of the constitution which provides as follows: " The governor shall have power to disapprove of any item or items of any bill making appropriations of money, embracing distinct items, and the part or parts of the bill approved shall be the law, and the item or items of appropriation disapproved shall be void, unless repassed according to the rules and limitations prescribed for the passage of other bills over the executive veto."

The general appropriation bill out of which this contention arises was approved by the governor on May 13, 1899. Section 8 is as follows: " For the support of the public schools of this commonwealth for the two years commencing on the first day of June, one thousand eight hundred and ninety-nine, the sum of eleven million dollars, to be paid on warrants of the Superintendent of Public Instruction in favor of the several school districts of the Commonwealth : Provided, that the city of Philadelphia shall be entitled to a proper portion of this ap-

propriation, and out of the amount received by the city of Philadelphia there shall be paid the sum of three thousand dollars to the Teachers' Institute of said city, the sum of three thousand dollars to the Philadelphia School of Design for Women for their corporate purposes, and the sum of ten thousand dollars to the Teachers' Annuity and Aid Association of said city: Provided further, that warrants for the above, and all other unpaid appropriations for common school purposes, shall be issued in amounts designated by the state treasurer, and whenever he shall notify the superintendent of public instruction, in writing, that there are sufficient funds in the state treasury to pay the same." After having approved the general appropriation bill the governor excepted therefrom certain items, one of which was the item in section 8, and disposed of it as follows: " I approve of so much of this item which appropriates five million dollars annually, making ten million dollars for the two years beginning June 1, 1899, and withhold my approval from five hundred thousand dollars annually, making one million dollars for the two school years beginning the first day of June, 1899." The school district at whose instance the writ of mandamus was applied for, denies the authority of the governor to veto a part of this item of $11,000,000, and thereby reduce the sum appropriated by the legislature for the use of the public schools. The question at issue requires the construction of section 16 of article 4 of the constitution quoted above.

It may be well to observe here that the governor has not vetoed any item directed to be specially appropriated from the part of the fund to which Philadelphia is entitled. His authority to disapprove any of those items is not an issue here, nor can it be invoked in aid of the construction claimed by the respondent or to sustain the authority of the executive to veto the one item of which the school fund is composed.

By section 15 of article 4, every bill passed by the assembly is required to be presented to the governor for his approval or disapproval. If he approve, it becomes a law, but if he veto it, it must be returned to the assembly, and if it is then passed by a two-thirds vote, it likewise becomes effective as a law; otherwise, not. By article 3, section 26, no order, resolution or vote to which the concurrence of both houses is necessary, except on the question of adjournment, shall be effective until it is ap-

proved by the governor or repassed by a two-thirds vote over his veto.

For the purposes of this case it is unnecessary to inquire into the origin and extent of the veto power exercised by the governors of the several states of the union. It is sufficient to say that the royal prerogative of refusing assent to legislation possessed by the sovereigns of England does not belong to the governor, but only such portion of it as has been specially delegated to him. This is a consequence from the differences existing between feudal sovereignties and governments founded on compacts. There the sovereignty is lodged in the king, here it belongs to the people. There the veto power is inherent in the king as sovereign, here it remains with the people, except such part of it as they in their wisdom may clearly and distinctly grant to the executive. Such authority granted to the governor of Pennsylvania was conferred upon him by the constitution of 1873 and its extent and nature must be determined by that instrument. Former constitutions of the commonwealth did not contain any provisions similar to those embraced in article 3, section 26 and article 4, section 16. They are new to the organic law of the state. Prior to the adoption of the present constitution, the governor was compelled to approve or disapprove the entire appropriation bill, and could not give his consent to some of the items, and withhold it from others, embraced in the bill. This frequently led to the executive being coerced to approve many unwise and improper appropriations, as public necessity would not permit him to disapprove the whole bill. To remedy this evil, the veto power was extended by section 16 of article 4 so that he might strike out such items of an appropriation as were improper and permit the others to become effective. The section must be construed in the light of the purpose for which it was adopted, and the people did not intend to go further than was necessary to effect that object when they made it a part of the constitution.

Whatever veto authority the governor possesses, be it legislative or executive in its character, is, as has been said, conferred upon him by the constitution, and when he claims the right to exercise this power, it is incumbent upon him to show that the people have clearly delegated it to him. The grant of the power must be strictly construed: Field v. The People, 3

Ill. 79; Chance v. Merion County, 64 Ill. 66 ; State v. Farwell, 3 Pin. (Wis.) 393. In Field v. The People, Chief Justice WIL-, SON, speaking for the court, says : " In deciding this question (power of the governor), recurrence must be had to the constitution. That furnishes the only rule by which the court can be governed. That is the charter of the governor's authority. All the powers delegated to him by, or in accordance with, that instrument, he is entitled to exercise, and no others. The constitution is a limitation upon the powers of the legislative department of the government ; but it is to be regarded as a grant of powers to the other department. Neither the executive nor the judiciary, therefore, can exercise any authority or power, except such as is clearly granted by the constitution. . . . Upon the principle of our government, that the sovereign power of the state resides in the people, and that only such powers as they have delegated to their functionaries, can be exercised, where a claim of power is advanced by the executive, the question is, not whether the power in question has been granted to the people, but whether it has been granted to the executive ; and if the grant cannot be shown, he has no title to the exercise of the power." " The right of its exercise (veto power) by an executive," says HATCH, J., in People v. Board of Aldermen of the City of Buffalo, 20 N. Y. Supp. 53, " must always be supported by plain and undoubted authority." It is therefore clear that in the exercise of the veto power, the executive must act clearly within the constitutional provisions.

The third article of the constitution prohibits the legislature from passing any bill, except general appropriation bills, containing more than one subject. The same article requires the appropriation for the public schools to be embraced in the general appropriation bill. This, as we have seen, was done in the act of 1899. It is contained in section 8, and embraces but one item, to wit : $11,000,000, for the two years subsequent thereto.

Let us examine the language of article 4, section 16, of the constitution, and see if it, viewed in the light of other veto provisions of the instrument, sustains the interpretation placed upon it by the executive. In construing this section it is well to remember the language used by Chief Justice GIBSON in Monongahela Navigation Co. v. Coons, 6 W. & S. 114 : " A constitution is made, not particularly for the inspection of

lawyers, but for the inspection of the million, that they may read and discern in it their rights and their duties, and it is consequently expressed in the terms that are most familiar to them. Words, therefore, which do not of themselves denote that they are used in a technical sense, are to have their plain, popular, obvious and natural meaning." Section 16 confines the use of the veto power to bills making appropriations of money containing more than one item. Such bills are the only ones that may contain " more than one subject." As the school appropriation is, by the constitution, required to be embraced in the general appropriation bill, it is " one subject " of the many that the bill may contain. This could not be reached by the general veto power conferred on the governor by section 15 of article 4. That would authorize him to veto the whole bill, but not a single item of the bill. He must, therefore, resort to the power given him in section 16. The bill of 1899 " embraces distinct items," and therefore this provision of the constitution applies to it. The governor could under this authority disapprove of " any item or items " of the bill. By reference to the act it appears that the appropriations made for the several departments of the government, except that for the support of the public schools, are each divided into, and composed of, several items. The executive may, therefore, in his discretion, disapprove one or more of the items in each or all of the several appropriations. The part or parts of the bill composed of entire items, and not the part or parts of entire items, he may approve and thus make them the law. In other words, the executive has authority to select such of the many items contained in a general appropriation bill as he may desire and disapprove them, and the parts of the bill embracing separate and entire items, which he approves, shall be the law. Item, as used in the constitutional provision, signifies a specific sum appropriated to a specific purpose, and not a fractional part of said sum thus appropriated. Such is the plain language of the instrument, and in its interpretation there is no necessity for resorting to any technical rules of construction, or to the exposition of it by former executives. When the language of the constitution is plain it is not within the province of the court to speculate as to the purpose of its framers : 6 Am. & Eng.

Ency. of Law (2d ed.), 922. Extrinsic aid in the construction of it may be resorted to only where doubts exist which it is impossible to solve from an inspection of the instrument itself: 6 Am. & Eng. Ency. of Law (2d ed.), 929.

The executive, however, maintains that his authority to veto is not confined to "any item or items" of the bill, but that he may disapprove a "part of an item," and such is the argument here by the attorney general for the respondent. This, as we have seen, is not the plain, obvious meaning of the language used in the instrument itself. To sustain the position it is argued for the respondent that, unless his construction be given the section, and the executive be thereby permitted to annul its requirements, the governor cannot obey the 4th section of article 9 and keep the appropriations within the revenues of the state. This interpretation may appeal strongly to the lay mind and convince the over-burdened taxpayer that the executive is enforcing the constitution by violating it, but it will find no support in the well established canons of constitutional construction. As was said by the late Chief Justice GREEN in the very recent case of Commonwealth v. Griest, 196 Pa. 411, in speaking of an alleged conflict between two articles of the constitution, " each one contains all the essentials for its complete enforcement without impinging at all upon the functions of the other. And it follows further that because each of these articles is of equal dignity and of obligatory force with the other, neither can be used to change, alter or overturn the other." But is such power necessary to prevent the state from becoming involved beyond its revenues? Clearly not. The executive has the authority to veto the whole of any item of, or an entire bill making, an appropriation. Aside from the school fund, he could therefore have destroyed the entire appropriations if he had so desired and the emergency had required it. But it may be suggested that this would have stopped the wheels of the government, and would have been a violation of the constitution. Concede it. The executive would then have been placed in the position of violating another part of the constitution instead of infringing article 4, section 16. The difference is only as to what part of the instrument shall be violated, and in bestowing upon the governor the authority to determine which part of the organic law he will

enforce and what part he will annul. Such a construction is not in consonance with any rule in the books.

It is contended by the respondent that because the governor may disapprove of a distinct item of an appropriation bill, he may reduce that item to any sum he may desire to approve. The practical operation of such a construction of his veto power would be to annul section 1 of article 2 of the constitution which provides that "the legislative power of this commonwealth shall be vested in a general assembly." It is well known that most of the appropriation bills are passed upon by the governor after the legislature has adjourned and consequently after it has had an opportunity to repass the bills over his disapproval. He could, therefore, under the authority claimed by respondent, determine the amount of every appropriation by reducing the various items embraced in general appropriation bills. This is solely a legislative function under the constitution which in no form is granted to him in that instrument. It places the legislature in the position of being able to fix the maximum of an appropriation to any object, subject, however, to the will of the governor whether he will permit the members of that body to exercise their judgment as to the amount of the item appropriated. Such was clearly not the intention of the people who adopted the constitution. The executive may, for any reason deemed sufficient by him, deprive the beneficiary of the item appropriated, unless subsequently passed over his veto, but he is not empowered to take from the legislature its constitutional prerogative of fixing the amount of the item to be appropriated. That is purely a legislative, and not an executive, function under the constitution of Pennsylvania.

The counsel for the respondent in further support of his position, directs attention to article 10, section 1, which requires the general assembly to "appropriate at least one million dollars each year for that (school) purpose." He argues that this is mandatory on the governor. If this be true, what would the governor do if the $1,000,000 thus constitutionally required to be appropriated should, with other appropriations deemed necessary by the executive, exceed the revenues of the state? His position seems to me to be illogical. His argument, as we have seen, is that the school appropriation of 1899 must be scaled down in order to keep it within the revenues. He con-

cedes that he must arrest the scaling process when he arrives at the $1,000,000 point. Why stop there if the appropriations are still in excess of the revenues? The object to be attained in reducing the appropriations is the same as when the process was begun on the $11,000,000 fund, to wit: to bring it within the revenues as required by section 4 of article 9 of the constitution. He cannot logically stop the reduction until the whole appropriation is wiped out if the condition of the state treasury require it. In other words, the construction he invokes in the case at bar which gives the governor the right to disapprove a part of an item to keep the appropriations within the revenues, necessarily leads to the conclusion that the executive may destroy the entire school fund in order to protect the credit of the state. This is directly antagonistic to the position of the counsel for the respondent that article 10, section 1 is mandatory on the governor.

I do not deem it necessary to discuss the right of the governor to veto an appropriation of $1,000,000 which the general assembly is required to make for the annual expenses of the public schools. It may be that he possesses that power, should the necessities of the occasion require the exercise of it. While I think it is clear that it was the intention of the framers of the constitution that at least $1,000,000 should be annually appropriated for the purpose, yet the language of the section is that "the general assembly . . . . shall appropriate at least $1,000,000 each year for that purpose," and not that there shall be appropriated that sum for the purpose. Nothing is said in the section as to what action in regard to the appropriation the executive may, or may not take. His authority in the premises, therefore, must be sought in the other provisions of the instrument. However, I express no opinion as to the proper construction of the section. I may add that the necessity for the executive's disapproval of the minimum sum thus required to be appropriated is too remote to be seriously considered. As I have said, he could use his veto on all other appropriations first, and when he had done so, it is practically certain that he would have no occasion to attack the school fund and the constitutional provision which protects it.

There is no real conflict between the provisions of the constitution involved in the disposition of this case and no diffi-

culty in carrying them into execution. Such a condition of affairs can only arise on presumptions wholly unfounded and unwarranted. To justify the executive in vetoing a part of this appropriation he must assume that (*a*) the expenditures of the government will exceed its revenues, and that (*b*) the legislature, a co-ordinate and coequal branch of the government, will violate the constitution in making appropriations in excess of the revenues. I do not think it lies with one branch of the government to assume that a co-ordinate branch will violate the organic law of the state. As said by Chief Justice BLACK in Commonwealth v. Hartman, 17 Pa. 119, "a decent respect for a co-ordinate branch of the government compels us to deny that any such danger can ever exist." It is evident that the framers of the constitution and the people who adopted it never anticipated such a condition of affairs in the state. They presumed that the legislature, like the executive, would perform its constitutional duty. Above all, they never conceived the idea that the appropriations would so far exceed the revenues that the governor could not, by the use of the general veto power conferred by the constitution, bring them within the available funds of the state.

So far I have discussed the abstract question of the right of the governor to veto a part of the appropriation contained in the single item in section 8 of the general appropriation bill. Turning, however, to the respondent's answer we find in paragraph seven the following: "The respondent admits that there are sufficient funds in the state treasury to pay said school district its proportionate share of the amount to which it is entitled, whether made upon the basis of $5,000,000 annually or $5,500,000 annually, and he further avers that he is willing to designate the amount due said district on whatever basis the court shall decide it is entitled to receive the same." This shows that the executive's anticipation of a depleted treasury was groundless and that there are sufficient funds in the treasury to pay the school district on the basis of the full appropriation made by the legislature. The respondent, therefore, does not deny that he has the funds to comply with the demand of the writ if it is issued. But if the prospective deficiency in the revenues had been realized as anticipated by the governor, the act itself making the appropriation would have protected

the treasury from the demands of the school districts of the state, and would have afforded the state treasurer a complete and sufficient answer to this application. The proviso to the appropriation is as follows: "That warrants for the above, and all other unpaid appropriations for common school purposes, shall be issued in amounts designated by the state treasurer, and whenever he shall notify the superintendent of public instruction, in writing, that there are sufficient funds in the state treasury to pay the same." The appropriation, therefore, was not payable until the state treasurer notified the superintendent of public instruction that he had sufficient funds for the purpose. Until the money was in the treasury, the state treasurer could, under the proviso to the appropriation act, refuse all demands on him for the appropriation, and could successfully resist official action to compel him to pay it. This application is to require the state treasurer to notify the superintendent of public instruction that he has the funds to enable him to pay the appropriation, and is therefore in accordance with this provision of the act, and was a recognition of its effectiveness by the attorney general when he granted the school district permission to apply in his name for the writ of mandamus.

The counsel for the respondent and the executive in his veto urge in favor of their construction of this provision of the constitution, that former governors have put a like interpretation upon the authority to veto a part of a single item of an appropriation. A similar reason was unsuccessfully invoked by the present executive and his attorney general in Commonwealth v. Griest, supra, in support of the governor's right to veto a resolution of the legislature proposing an amendment to the constitution. Deference is accorded the construction of a statute or constitutional provision by the legislative or executive branch of the goverment, but it is only considered in aid of interpretation when the instrument to be construed is itself ambiguous and not free from doubt. When the language is plain and the intent of the provision is clearly deducible, extrinsic circumstances and practical construction are not permitted to have any force in its interpretation: Story on Constitution, sec. 407; Cooley's Constitution Limitation, 84. The rule, therefore, cannot be invoked to aid in the construction of this section of the constitution. I think the section in question is not ambiguous nor susceptible

of two interpretations and hence its language is the sole guide to its construction. However, an examination of the veto messages referred to in the respondent's brief shows that all of them do not support his construction of the constitutional provision in question. Some have no application by reason of dissimilar facts, others suggest necessity as the basis of their action and interpretation, while others distinctly recognize the lack of authority in the executive to disapprove of a part of an item. Such construction is worthless as a precedent to a court of justice in the interpretation of a constitutional provision.

As the result of a consideration of the merits of the contention, I am clearly of the opinion that the executive was without authority to disapprove $1,000,000 of the total appropriation by the legislature for the support of the public schools. The bill having been approved by the governor, and the exception therefrom of a part of the school fund item being void, the entire amount became effective for the purpose for which it was appropriated. The propriety of appropriating such a large sum may be challenged, and the suggestion of the governor that it is "a larger sum than is appropriated by any other state in our great country" is doubtless true ; but with these he can have no concern. The people of the commonwealth adopted a constitution authorizing the general assembly to make the appropriation without granting the excutive authority to disapprove a part of it, and with them rests the responsibility for the sum appropriated. From the constitutional provision requiring a minimum sum to be appropriated for the use of the public schools, it is evident that the people regarded the fund so appropriated as sacred, and desired it to be beyond the control of the executive. It is so written in the organic law of the state and no power, judicial or executive, should be permitted to frustrate the clearly expressed object.