CITY OF PHILADELPHIA, and John
F. Street, individually as a taxpayer
and in his official capacity as Mayor
of Philadelphia, Petitioners

v.

COMMONWEALTH of Pennsylvania,
Edward G. Rendell, in his official ca-
pacity as Governor of the Common-
wealth of Pennsylvania; Robert C. Ju-
belirer, President Pro Tempore of the
Senate of the Commonwealth of
Pennsylvania; John M. Perzel, Speak-
er of the House of Representatives of
the Commonwealth of Pennsylvania;
Robert J. Mellow, Minority Leader of
the Senate of the Commonwealth of
Pennsylvania; H. William DeWeese,
Minority Leader of the House of Rep-
resentatives of the Commonwealth of
Pennsylvania; and Pennsylvania Con-
vention Center Authority, Respon-
dents.

Commonwealth Court of Pennsylvania.

Heard Feb. 10, 2003.

Decided Feb. 19, 2003.

Publication Ordered Dec. 2, 2003.

Corrected Opinion Ordered Published
Feb. 23, 2007.

Jennifer R. Clarke, Edward T. Fisher, Robert C. Hein, Philadelphia, for petitioners.

John P. Krill, Jr., and Linda J. Shorey, Harrisburg, for respondents, Jubelirer and Ryan.

Calvin R. Koons, Harrisburg, for respondents, Com. of PA and Gov. Rendell.

James J. Conaboy, Scranton, for respondent, Senator Mellow.

Alfred W. Putnam, Philadelphia, for respondent, Phila. Parking Authority.

Joseph M. Cosgrove, Forty Fort, Michael P. Edmiston and Reizdan B. Moore, Harrisburg, for respondent, H. William DeWeese.

OPINION BY President Judge COLINS.

The City of Philadelphia and its Mayor, John F. Street, question the validity of Act 230 of 2002[1] and have requested expedited preliminary injunctive relief in this Court's original jurisdiction. Act 230 has been characterized as a "state takeover" of the Pennsylvania Convention Center, and was enacted by the General Assembly in late 2002 and signed into law by then-Governor Schweiker on December 30, 2002. Petitioners filed this action on January 23, 2003, and requested expedited consideration due to the "chaos" occasioned by Act 230 and the uncertainty surrounding the various entities whose functions or duties will be affected by the Act.[2] This Court granted petitioners' request for expedited consideration and scheduled a hearing on the motion for preliminary injunctive relief for February 10, 2003.

---

1. Act of December 30, 2002, P.L. ——.

2. Petitioners also filed an Emergency Application for Extraordinary Relief in the Pennsylvania Supreme Court, docketed at No. 10 E.M. 2003. By order dated January 27, 2003, the Supreme Court denied the application.

## I. FINDINGS OF FACT

### A. Legislative History[3]

1. Senate Bill 1100 (SB 1100) was introduced and referred to the Senate Committee on Local Government on October 9, 2001.

2. SB 1100's initial title was "AN ACT Amending Title 53 (Municipalities Generally) of the Pennsylvania Consolidated Statutes, further providing for governing body of municipal authorities." SB 1100, Printer's Number (PN) 1381.

3. SB. 1100 as introduced was 5 pages in length and amended 53 Pa.C.S. § 5610(b) by adding a new paragraph (2).

4. SB 1100, PN 1381 was reported as committed by the Local Government Committee on November 20, 2001.

5. SB 1100, PN 1381 received consideration in the Senate on three separate days; November 20, December 3 and December 4, 2001. The bill passed the Senate on December 4, 2001 by a vote of 50–0.

6. On December 10, 2001, SP 1100, PN 1381 was referred to the House Local Government Committee, which reported the bill to the House as amended on June 12, 2002, now bearing PN 2077. SB 1100, PN 2077 received its first consideration in the House on June 12, 2002.

7. SB 1100, as reported by the House Committee on Local Government, made additional changes to 53 Pa.C.S. § 5610(b) and made changes to 53 Pa.C.S. § 5612(b), which concerned fiscal reporting.

8. SB 1100, PN 2077 was 8 pages in length and was titled "AN ACT Amending

---

3. The parties have stipulated to the Legislative History of Senate Bill 1110, which appear here as Findings of Fact ##1—23. The stipulations have been somewhat reordered.

Title 53 (Municipalities Generally) of the Pennsylvania Consolidated Statutes, further providing for governing body of municipal authorities AND FOR CERTAIN FISCAL REPORTING." The language appearing in upper case in the title was added by the House Committee.

9. SB 1100, PN 2077 was considered by the full House of Representatives on June 12 and June 17, 2002, and was then re-committed to the House Appropriations Committee. The bill was re-reported by the Appropriations Committee on June 19, 2002, but again re-committed to the Appropriations Committee on June 24, 2002. The Appropriations Committee amended the bill and re-reported it to the full House on June 25, 2002, now bearing Printer's Number 2139.

10. This version of the bill did not change the title, but included new language proposing to add a new Chapter 15 ("Appeals to Court") to Subpart B of Part III of Title 53, relating to appeals from Zoning Boards of Adjustment in Cities of the First Class. SB 1100, PN 2139 was 9 pages in length.

11. SB 1100, PN 2139 was again amended on third consideration in the House on June 26, 2002, now bearing PN 2157.

12. The effect of the changes made by the House on third consideration was to delete the addition of a new Chapter 15 made by the House Appropriations Committee, and the amendment of Chapter 13 of Title 53 to add a new Subchapter G ("Miscellaneous Provisions") relating to the acceptance of gifts or donations by the governing body of a municipality.

13. SB 1100, PN 2157 was 12 pages in length and titled "AN ACT Amending Title 53 (Municipalities Generally) of the Pennsylvania Consolidated Statutes, PRO-VIDING FOR ACCEPTANCE OF GIFTS OR DONATIONS; AND further providing for governing body of municipal authorities AND FOR CERTAIN FISCAL REPORTING."

14. The House passed SB 1100, PN 2157 on June 26, 2002 by a vote of 201–0.

15. SB 1100, PN 2157 was then returned to the Senate for concurrence on House amendments, and was referred to the Committee on Rules and Executive Nominations on June 27, 2002.

16. The Senate Rules Committee re-reported the bill on concurrence without further amendments on October 9, 2002. The same day, however, the bill was re-committed to the Rules Committee.

17. On November 26, 2002, the Senate Rules Committee reported the bill to the full Senate on concurrence, with its final amendments, now bearing PN 2436.

18. The changes made by the Senate Rules Committee were:

(1) the amendment of 53 Pa.C.S. § 2164 ("Powers and Duties of Commission") to require the Municipal Police Officers' Education and Training Commission to revoke a police officer's certification for engagement or participation in political or campaign election activity that violates 53 Pa.C.S. § 2166.1;

(2) the addition of 53 Pa.C.S. § 2166.1 ("Prohibition on Political Activity");

(3) the amendment of 53 Pa.C.S. § 5503 to add new definitions;

(4) the amendment of 53 Pa.C.S. § 5503 to add language to paragraph 9 and to add new paragraphs 22, 23 and 24, relating to parking authorities in Cities of the First Class;

(5) the amendment of paragraphs (k) ("compensation") and (o) ("management") of 53 Pa.C.S. § 5508.1 ("Special Provisions for Authorities in Cities of the First Class");

(6) the addition to Chapter 55 of Title 53 ("Parking Authorities") of 5508.2 ("additional special provisions for authorities in Cities of the First Class; mixed use projects"), § 5510.1 ("management of authority funds in Cities of the First Class"), § 5510.2 ("special funds in Cities of the First Class"), § 5510.3 ("bonds in Cities of the First Class"), § 5510.4 ("contracts with obligees of an authority in Cities of the First Class"), § 5510.5 ("Commonwealth pledges in Cities of the First Class"), § 5510.6 ("provisions of bonds and trust indentures in Cities of the First Class"), § 5510.7 ("funds collected on behalf of a municipality"), § 5510.8 ("bonds to be legal investments"), § 5510.9 ("validity of pledge"), § 5510.10 ("security interest in funds and accounts"), § 5510.11 ("limitation on authority under the federal bankruptcy code");

(7) further amendment to the provisions relating to governing body of municipal authorities in Chapter 56 of Title 53;

(8) the addition to Title 53 of Chapters 57 ("Taxicabs and Limousines in First Class Cities"), 58 ("Contractors Bonds and Financial Security for Redevelopment Contracts"), and 59 ("Pennsylvania Convention Center Authority")(codifying, with amendments, *inter alia*, to the governing board of the Convention Center, the Pennsylvania Convention Center Authority Act, Act of June 27, 1986, P.L. 267, *formerly* 53 P.S. §§ 16201–16224);

(9) the addition of repeals, including the repeal of section 209(k) of the Pennsylvania Intergovernmental Cooperation Authority Act for Cities of the First Class, Act of June 9, 1991, P.L. 9, *formerly* 53 P.S. § 12720.209(k) ("Effect of [financial] plan [of an assisted city] upon certain arbitration awards") (PICA Act);

(10) the addition of provisions addressing impact, providing guidance and making an appropriation in connection with the transfer of the duty and responsibility for regulation of taxicabs and limousine service in Cities of the First Class to the Philadelphia Parking Authority;

(11) the addition of provisions addressing impact and providing guidance in connection with the codification and amendment (including the change in the governing body) of the Pennsylvania Convention Center Act;

(12) the addition of varying effective dates.

19. SB 1100, PN 2436 was 127 pages in length and was entitled "AN ACT Amending Title 53 (Municipalities Generally) of the Pennsylvania Consolidated Statutes, providing for acceptance of gifts or donations; and further providing DONATIONS; FURTHER PROVIDING FOR POWERS AND DUTIES OF THE MUNICIPAL POLICE OFFICERS' EDUCATION AND TRAINING COMMISSION; PROHIBITING POLITICAL ACTIVITY BY MUNICIPAL POLICE OFFICERS; FURTHER PROVIDING, IN PARKING AUTHORITIES, FOR DEFINITIONS, FOR PURPOSES AND POWERS AND FOR SPECIAL PROVISIONS FOR AUTHORITIES IN FIRST CLASS CITIES; PROVIDING, IN PARKING AUTHORITIES IN FIRST CLASS CITIES, FOR ADDITIONAL SPECIAL PROVISIONS, FOR MANAGEMENT OF AUTHORITY FUNDS, FOR SPECIAL FUNDS, FOR BONDS, FOR CONTRACTS WITH AUTHORITY OBLIGEES, FOR COMMONWEALTH PLEDGES, FOR BOND AND TRUST INDENTURES, FOR FUNDS COLLECTED, FOR BONDS AS LEGAL INVESTMENTS, FOR PLEDGE VALIDITY, FOR SECURITY INTERESTS IN FUNDS AND ACCOUNTS AND FOR BANKRUPTCY LIMITATIONS; FURTHER PROVIDING FOR MUNIC-

IPAL AUTHORITY GOVERNING BODIES AND MONEY; PROVIDING FOR REGULATION OF TAXICABS AND LIMOUSINES IN FIRST CLASS CITIES; FURTHER PROVIDING for governing body of municipal authorities and for certain fiscal reporting CODIFYING THE ACT OF JUNE 27, 1986 (P.L. 267, NO. 70), KNOWN AS THE PENNSYLVANIA CONVENTION CENTER AUTHORITY ACT; DEFINING "EXPANSION OR SUBSTANTIAL RENOVATION"; FURTHER PROVIDING FOR PURPOSES AND POWERS AND FOR CAPITAL AND OPERATING BUDGETS; PROVIDING FOR EXPANSION FUNDING; FURTHER PROVIDING FOR GOVERNING BOARD, FOR MONEYS OF THE AUTHORITY, FOR AWARD OF CONTRACTS, FOR INTERESTS OF PUBLIC OFFICERS AND FOR RENTAL TAX; MAKING AN APPROPRIATION; AND MAKING REPEALS."

20. On November 26, 2002, the Senate concurred in the House Amendments, as further amended in the Senate Rules Committee, by a vote of 27–21.

21. The House of Representatives concurred in the Senate Amendments on November 27, 2002 by a vote of 172–23.

22. SB 1100, PN 2436 was signed in the Senate and in the House on November 27, 2002; the House and Senate also adjourned *sine die*, as required by law, on November 27, 2002 (the day before Thanksgiving).

23. Governor Schweiker signed the bill on December 30, 2002, thereby enacting it as Act 230 of 2002.

B. Testimony Relating to Harm

24. Petitioners presented the testimony of Joseph C. Vignola, Executive Director of the Pennsylvania Intergovernmental Cooperation Authority (PICA).

25. Mr. Vignola's background includes a Bachelor of Science degree in Economics from the Wharton School of the University of Pennsylvania, a Juris Doctor degree from the Temple University School of Law and a certificate in state and local government from the Harvard University Kennedy School of Government.

26. Mr. Vignola has held office as a City Commissioner of the City of Philadelphia and two terms as City Controller of Philadelphia. He has been Executive Director of PICA since April of 1995.

27. Given Mr. Vignola's background, we find him eminently well-qualified to testify concerning the fiscal affairs of the City of Philadelphia, and further find his testimony completely credible.

28. Mr. Vignola testified regarding Section 209(k) of the PICA Act, which was repealed by Act 230. He stated that the provision, referred to by PICA staff as the "ability to pay provision", requires arbitrators in police and firefighter interest arbitration cases in Philadelphia to consider the City's ability to pay in making their award. Section 209(k) also allows the question of the City's ability to pay to be raised as an issue on appeal.

29. Mr. Vignola stated that in the current fiscal year, some $850 million in the City's budget is dedicated to pay salary and fringe benefits of police and firefighters, accounting for 27% of the City's operating budget.

30. Mr. Vignola further stated that the repeal of section 209(k) would harm PICA's essential mission of maintaining the fiscal stability of the City of Philadelphia.

31. Mr. Vignola stated that PICA will be issuing a series of refunding bonds on June 15, 2003, and that the repeal of section 209(k) will likely have an adverse af-

fect on the bond issue, since section 209(k) is "one of the things that help sell PICA bonds."

32. Mr. Vignola testified that a bill proposing to repeal section 209(k) was introduced in 1995, but was not enacted. At that time, Mr. Vignola, as Executive Director of PICA, was made aware of the proposal, and submitted comments to the bill's sponsors.

33. Mr. Vignola was unaware of the repeal of section 209(k) contained in SB 1100 until after the bill's passage. Had he been aware of the repeal, Mr. Vignola would have attempted to provide comments to the General Assembly regarding the perceived effect of the repeal on PICA and the City of Philadelphia.

34. The repeal of section 209(k) will have a deleterious, if not, disastrous effect upon the City's fiscal stability resulting in future tax increases upon the citizenry.

35. Petitioners also presented the testimony of John F. Street, Mayor of the City of Philadelphia.

36. Mayor Street's background includes 19 years service as member of Philadelphia City Council, including 7 years as Council President. Mayor Street was elected to the office of Mayor in 1999.

37. Mayor Street has testified before arbitration panels, and is personally familiar with section 209(k) of the PICA Act and its affect on arbitration awards in Philadelphia.

38. We find Mayor Street's testimony completely credible insofar as it relates to the fiscal affairs of the City of Philadelphia, a subject on which Mayor Street is extremely knowledgeable and well-versed through personal experience.

39. Mayor Street testified that arbitration proceedings are currently in progress as to the City's firefighters, and that the effect of the repeal of section 209(k) is unclear. Mayor Street opined that the repeal might be construed as prohibiting the City from presenting evidence relating to its ability to pay in the arbitration proceedings, or from raising that issue on any subsequent appeal.

40. Mayor Street testified regarding the Pennsylvania Convention Center and its operations, noting that the City of Philadelphia is solely responsible to pay the debt service on the bonds that capitalized the development of the Center, and further noting that the City bears the sole responsibility for operating deficits of the Center.

41. Mayor Street testified that because the City is the party ultimately responsible for the expenditures of the Center, the City has exercised control over the Center's budget through involvement of the City Finance Director.

42. Mayor Street testified that Act 230 reorganizes the Board of the Convention Center, considerably diluting the City's representation on that Board.

43. Mayor Street testified that Act 230 severely limits the role of the City Finance Director in regulating the finances of the Philadelphia Parking Authority.

44. The controversies concerning the Convention Center Board as well as the lack of a professional management team are jeopardizing the Convention Center's ability to attract clients.

45. Representative Babette Josephs (182nd Legislative District) testified concerning the events in the House of Representatives at the time the House concurred in the Senate Amendments to SB 1100.

46. Representative Josephs testified that the final vote on the bill occurred at the end of a 15-hour day, during which proceedings and debates were confused and sometimes contentious.

47. Representative Josephs testified that she voted "yes" on concurrence, but was unaware at that time of several of the provisions contained in the final version of the bill.

48. We find the testimony of Representative Josephs credible as it relates to her own knowledge and actions relative to the House concurrence on SB 1100.

49. Representative Kathy Manderino (194th Legislative District) also testified regarding the same events.

50. Representative Manderino testified that she was unaware of many of the provisions in SB 1100, or of the effects of those provisions on the City of Philadelphia.

51. Representative Manderino was recorded as voting "yes" on the concurrence vote in the House of Representatives.

52. Representative Manderino was under the impression that she had voted no on SB 1100 when she left the House Chambers that evening.

53. We find the testimony of Representative Manderino credible as it relates to her own knowledge and actions relative to the House concurrence on SB 1100.

## II. MIXED FINDINGS OF FACT AND CONCLUSIONS OF LAW

1. While the Court finds the testimonies of Representatives Josephs and Manderino completely credible the enrolled Bill Doctrine prohibits the Court from giving any weight to their testimony.

2. The Court finds Petitioner's argument exhibit 2 reproduced below to be a correct statement of fact and law, and therefore, adopts it as its finding.

### WHERE DID THE SUBJECTS * IN ACT 230 ORIGINATE?

### *OUTSIDE* TITLE 53 OF THE PENNSYLVANIA CONSOLIDATED STATUTES

| ACT 230 SUBJECT | FORMERLY LOCATED IN: |
| --- | --- |
| Gifts Given in Trust | Various provisions in each locality. *E.g.,* Philadelphia's Board of City Trusts established by 1869 statute, found at 53 P.S. §§ 16365 *et seq.* Other municipalities have similar boards. |
| Political Activity by Police Officers | Individual civil service laws and rules pertaining to individual local governments, such as the Philadelphia Home Rule Carter Section 10–107. |
| Taxi and Limousine Regulation in Cities of the First Class | Public Utility Code, 66 Pa.C.S. §§ 101 *et seq.* |
| Contractors Bonds and Financial Security for Redevelopment Contracts | Urban Redevelopment Law (35 P.S. §§ 1701 *et seq.*) and the Public Works Contractors' Bond Law of 1967 (8 P.S. §§ 191 *et seq.*) |
| Pennsylvania Convention Center Authority | Pennsylvania Convention Center Authority Act (the Act of June 27, 1986 (P.L. 267, No. 70)), 53 P.S. §§ 16201 *et seq.* |
| PICA repeal—Subsection 209(k) of PICA | The Pennsylvania Intergovernmental Cooperation Authority Act for Cities of the First Class (the Act of June 5, 1991 (P.L. 9, No. 6)), 53 P.S. §§ 12720.101 *et seq.* |
| Changes in Residence Requirements for Boards of Authorities in Towns and Boards of Business Improvement Districts in Boroughs | The Neighborhood Improvement District Act (the Act of December 20, 2000 (P.L. 949, No. 130)), 73 P.S. §§ 881 *et seq.* |

* Does not list *all* subjects in Act 230.

3. Act 230 of 2002 is facially violative of Article III, section 3 of the Pennsylvania Constitution.

## III. ALLEGED CONSTITUTIONAL DEFICIENCIES

Petitioners assert five distinct constitutional deficiencies arising from the proce-

dure detailed in our Findings of Fact, namely, three separate violations of Article III, Section 3, and one violation each of Article III, Section 4 and Article III, Section 6. These sections provide as follows:

Section 3. No bill shall be passed containing more than one subject, which shall be clearly expressed in the title, except a general appropriation bill or bill codifying or compiling the law or a part thereof.

Section 4. Every bill shall be considered on three different days in each House. All amendments made thereto shall be printed for the use of the members before the final vote is taken on the bill and before the final vote is taken, upon written request addressed to the presiding officer of either House by at least 25% of the members elected to that House, any bill shall be read at length in that House, No bill shall become law, unless on its final passage the vote is taken by yeas and nays, the names of the persons voting for and against it are entered on the journal, and a majority of the members elected to each House is recorded thereon as voting in its favor.

Section 6. No law shall be revived, amended, or the provisions thereof extended or conferred, by reference to its title only, but so much thereof as is revived, amended, extended or conferred shall be re-enacted and published at length.

As to the alleged Section 3 violation, petitioners allege that the expansion of SB 1100 by the Senate Rules committee to include a myriad of subjects having no relationship to one another constitutes a violation of the single-subject requirement. Petitioners further allege that the title of the final version of SB 1100 failed to refer in any manner to large substantive changes made by the final version of the bill, specifically the repeal of a portion of the Pennsylvania Intergovernmental Cooperation Authority Act for Cities of the First Class (PICA Act), and the addition of an entire new Chapter 58 to Title 53, entitled Contractors Bonds and Financial Security For Redevelopment Contracts.

## IV. SPECIAL RELIEF

Petitioners here seek special relief in the nature of a preliminary injunction. Equity will grant a preliminary injunction if the petitioner's right to relief is clear, the need for relief is immediate, and the injury will be irreparable if the injunction is not granted. *Zebra v. Pittsburgh School District*, 449 Pa. 432, 296 A.2d 748 (1972). Because the grant of a preliminary injunction is a harsh and extraordinary remedy, it is to be granted only when and if *each* criteria has been fully and completely established. *Committee of Seventy v. Albert, et al*, 33 Pa.Cmwlth. 44, 381 A.2d 188 (1977).

## V. PRELIMINARY OBJECTIONS

Preliminary objections to the petition for review have been filed by all respondents as well as by Intervenor Philadelphia Parking Authority. The Court intends to hold oral argument on all preliminary objections before an *en banc* panel in the near future. As some of the preliminary objections raise issues of jurisdiction, however, we must make a threshold determination of probable jurisdiction, otherwise the preliminary injunction should be denied. *Aitkenhead v. Borough of West View*, 40 Pa.Cmwlth. 547, 397 A.2d 878 (1979).

The preliminary objections that relate to jurisdiction include the standing of Mayor Street and the City to bring this action, the alleged failure to join indispensable parties, and the non-justiciability under the Enrolled Bill Doctrine. Recently,

this Court discussed the standing of Mayor Street and the City in a similar action challenging Act 22 of 2001, which amended statutory provisions relating to the Philadelphia Parking Authority. In *City of Philadelphia, et al v. Schweiker, et al.*, No. 343 M.D. 2001, 817 A.2d 1217 (Pa.Cmwlth. 2003), an *en banc* panel of this Court sustained a preliminary objection challenging the City of Philadelphia's standing. Judge McGinley, in holding that the City lacked standing, concluded that "the City has not described or established a discernible adverse impact upon some interest." *Id.* at 1222. Here, both Mayor Street and the City have alleged adverse consequences of Act 230 that are substantial, direct and immediate. This case, therefore, is factually distinguishable from the facts present in *City of Philadelphia v. Schweiker.*[4]

Several of the preliminary objections also assert failure to join as indispensable parties various entities affected by Act 230. We note that the Philadelphia Parking Authority, which was not originally named as a respondent, has been granted intervention. PICA, an entity also affected by Act 230, has provided testimony of its Executive Director, and indicated the possibility of filing a separate lawsuit challenging the Act. While it is true that Act 230 affects numerous other parties, we are not prepared to find at this juncture that these parties are indispensable to the action.

■ Finally, several respondents argue that judicial review of Act 230 is precluded by the Enrolled Bill Doctrine. The history and current status of the Enrolled Bill Doctrine was set forth in *Pennsylvania AFL–CIO v. Com., Ridge, Governor*, 691 A.2d 1023 (Pa.Cmwlth.1997), *aff'd*, 563 Pa. 108, 757 A.2d 917 (2000). There, an *en banc* panel of this Court concluded that where the facts are agreed upon and the question presented is whether or not a mandatory constitutional provision was violated, judicial intervention is not only appropriate, but mandated. 691 A.2d at 1023. The Pennsylvania Supreme Court, while reversing on other grounds, specifically approved this analysis. 563 Pa. at 108, 114, 757 A.2d 917, 920. Therefore, we find preliminarily that the Enrolled Bill Doctrine does not bar judicial review of the constitutional challenges in this matter.

## VI. THE PROCEDURAL CHALLENGES

The "single-subject" requirement of Article III, Section 3 has been broadly construed. *Consumer Party v. Commonwealth*, 510 Pa. 158, 507 A.2d 323 (1986); *Pennsylvania AFL–CIO v. Ridge*, 683 A.2d 691 (Pa.Cmwlth.1996) (single-judge opinion by Colins, P.J.). Cases in which such a challenge has been brought involving a consolidated statute, however, are less common. In *Fumo v. Public Utility*

---

**4.** The Commonwealth Court's *en banc* opinion in *City of Philadelphia v. Schweiker* also sustained respondents' preliminary objections as to Count IX of the petition for review, alleging a violation of the single-subject requirement of Article III, Section 3. Judge McGinley's opinion noted that the single-subject challenge alleged that the bill dealt with two unrelated subjects; municipal authorities and parking authorities. In sustaining the preliminary objection, Judge McGinley concluded that the two subjects are inextricably intertwined, and, accordingly, permissible un-

der Article III, Section 3. While this conclusion is consistent with existing caselaw, we note that the act at issue in *Schweiker* was a act consolidating prior acts (with amendments) and repealing the prior acts; specifically the Municipal Authorities Act of 1945, Act of May 2, 1945 (P.L. 382) and the Parking Authority Law, Act of June 5, 1947, P.L. 458. Notably, the act in *Schweiker* did *not* attempt to amend laws unrelated to those being codified, a distinction which we believe to be of constitutional importance.

*Commission*, 719 A.2d 10 (Pa.Cmwlth. 1998), a bill was introduced proposing amendments to the Public Utility Code, Title 66 of the Consolidated Statutes. The original bill proposed to increase the maximum number of years that a taxi cab could be operated from 6 to 8. Prior to final passage, however, the bill was amended to add 84 pages of new language relating to the deregulation of the generation of electricity. This language was also added to Title 66, with some conforming amendments made to the Corporations and Unincorporated Associations Code (Title 15 of the Consolidated Statutes). A plurality of the Commonwealth Court, in an opinion authored by Judge Doyle, found no violation of the single-subject requirement.

While the bill at issue in *Fumo* survived constitutional scrutiny, that is not to say that any bill amending a consolidated statute escapes the requirement of Article III, Section 3. Because this bill both amends a Consolidated Statute and purports to consolidate existing law, a brief background of the history of Pennsylvania statutes is helpful. As noted by Judge Woodside in his treatise on Pennsylvania Constitutional law,

> Much of our law, civil and criminal, developed in the past century as part of the common law, but during this century more and more statutes replaced the common law. Unlike the so-called "code states" which from their formation depended solely upon an organized single code containing all the statutory law of that state, Pennsylvania's statutes "grew like Topsy." As a result, the only way to find statutes on a particular subject was through digests such as West's Statutes and, more recently, Purdon's Pennsylvania Statutes. Purdon's has seved [sic] the profession well becoming "the Bible" of the statutory law, but the "official" statutes are in the Pamphlet Laws and not Purdon's.

Although no attempt was made to officially codify the entire body of the law, many specific subjects were codified, such as in the Vehicle Code, the Crimes Code, the Commercial Code, the numerous municipal codes, and many, many others. The Supreme Court consistently held that these codes did not violate Article III, § 3 of the Constitution. *Gilbert's Estate*, 227 Pa. 648, 76 A. 428 (1910) (Intestacy Act); *Minsinger v. Rau*, 236 Pa. 327, 84 A. 902 (1912) (Public School Code of 1911); *Commonwealth ex rel. Woodruff v. Snyder*, 279 Pa. 234, 123 A. 792 (1924) (Administrative Code of 1923); *Commonwealth ex rel. Raker v. Macelwee*, 294 Pa. 569, 144 A. 751 (1929) (General Township Act of 1917); *Commonwealth v. Evans*, 156 Pa. Superior Ct. 321, 40 A.2d 137 (1944) (Election Code of 1937): *Lancaster City Annexation Case (No. 1)*, 374 Pa. 529, 98 A.2d 25 (1953) (Third Class City Code of 1951); *Commonwealth v. Solley*, 384 Pa. 404, 121 A.2d 169 (1956) (State Highway Law of 1945).

Robert E. Woodside, *Pennsylvania Constitutional Law* at 307–308 (1985).

These pre–1970 "codifications," of course, merely represented attempts to classify and collect statutes, and did not result in true "consolidated" statutes. It was not until 1970 that the General Assembly enacted a general "code" known as the Pennsylvania Consolidated Statutes. As originally enacted, the "code" was a mere framework for what was contemplated to contain all of the Commonwealth's statutory laws. Woodside at 308–309. Since 1970, the General Assembly has added some of the pre-existing "codes" to the Consolidated Statutes and has created other titles.

In 1967, Article III, Section 3 was amended by adding as an exception to the

"single subject" requirement "a bill codifying or compiling the law or a part thereof."

Judge Woodside notes that this amendment

> [W]as added partly to remove any doubt concerning the passage of existing types of codes, but primarily to create what was envisioned as a code containing the entire body of the Commonwealth's statutory law. Such a code would clearly contain "more than one subject" which would be prohibited by the first part of [Article III] section three.

*Id.* at 308.

However, lest it be thought that *any* bill pertaining solely to a consolidated statute automatically satisfies the "single subject" requirement, Judge Woodside further opined,

> Legislators and the professional draftsmen have avoided the position that an amendment to the Pennsylvania Consolidated Statutes can contain more than one subject clearly expressed in its title as that provision has been construed by the courts. They recognize, as every official should, that it was not the intent of the language added to the section in 1967 to write out of the Constitution the one-subject provision which has been so valuable to the orderly operation of the legislature in this Commonwealth.
>
> What the amendment has done is authorize the adoption of the Consolidated Statutes and remove all doubt about the constitutionality of the existing codes.

*Id.* at 309.

■ Applying this analysis to the present case, Senate Bill 1100 was introduced to make amendments to Title 53 of the Consolidated Statutes. Prior to the amendment by the Senate Rules Committee, additional amendments to Title 53 had been added, ranging from municipal authorities and fiscal reporting to appeals from Zoning Board of Adjustment in Cities of the First Class, all of which could arguably be brought under the subject matter of Title 53, "General Municipal Law."

The final amendment, however, did more. While the substantive language of that amendment also relates generally to the subject of "General Municipal Law," the amendments inserted by the Senate Rules Committee codified and amended a large body of pre-existing law, i.e., the Pennsylvania Convention Center Authority Act of 1986. Although it may be argued that the exception for "codification" of the law also allows amendments to the law, the fact that SB 1100 contained substantive amendments to the Convention Center Authority Act, codified the amended act as part of Title 53, and also made other unrelated amendments to Title 53 is well beyond the scope of what is permissible.

In *Common Cause v. Com., Ridge, Governor*, 668 A.2d 190 (Pa.Cmwlth.1995), *aff'd per curiam* 544 Pa. 512, 677 A.2d 1206 (1996), we construed the interrelationship between Article III, Section 3 and Article III, Section 11, relating to a General Appropriation Bill. We noted that Article III, Section 3 exempts a General Appropriation Bill from the single-subject requirement, and that our Supreme Court had long ago "recognized that the 'evils attendant' in excluding a [general appropriation bill] from the single subject requirement of Article III, section 3 are minimized by the restrictions imposed by Article III, section 11 upon the content of a [general appropriation bill.]" *Id.* at 197 (citing *Commonwealth v. Barnett*, 199 Pa. 161, 48 A. 976 (1901)). We further opined that

> "... Article III section 11 was intended to *restrict* the power of the legislature as a trade-off for the provision in Article III, section 3 which excludes a [general appropriation bill] from the single sub-

ject requirement. Because a [general appropriation bill] of necessity contains multiple subjects, the Article III, section 3 exclusion was a practical necessity. However, the potential for legislative abuse was limited by requiring that a [general appropriation bill] contain *only* appropriations . . . . "

*Id.*

Like the exception for a general appropriation bill, Article III, Section 3 was amended in 1967 to similarly exempt " a bill codifying or compiling the law or a part thereof." While such a bill is nowhere defined in the Constitution, it appears by analogy that limits were intended to apply, as there was certainly no intention that merely by the procedural fool of "codifying" a law the single subject restriction might be avoided entirely.

## VII. IRREPARABLE HARM

Joseph Vignola testified that Act 230 includes a repeal of Section 209(k) of PICA Act, 53 P.S. § 12720.209(k). That section relates to arbitration awards in Cities of the First Class pursuant to the Policemen and Firemen Collective Bargaining Act[5] (Act 111), and provides that arbitrators take into consideration and accord substantial weight to the City's approved financial plan and the financial ability of the City to pay the cost of such increase in wages or fringe benefits without adversely affecting levels of services. Mr. Vignola credibly testified that the repeal of Section 209(k) introduces uncertainty into the arbitration process, which is presently ongoing with respect to firefighters in Philadelphia.

Mayor John F. Street credibly testified as to the continuing uncertainty in the City's hospitality industry caused by the enactment and subsequent challenge to Act 230. Mayor Street further testified as to the harm to the City of Philadelphia that would arise from the repeal of Section 209(k) of the PICA Act, especially during ongoing arbitration proceedings between the City and its firefighters.

■ Representatives Josephs and Manderino testified regarding their understanding, or lack thereof, of the provisions inserted into SB 1100 prior to concurrence by the House of Representatives. Respondents raised several objections to this testimony. We recognize *dicta* in several opinions of this Court and the Pennsylvania Supreme Court noting the lack of proof of "actual confusion" on the part of legislators, which explains petitioners' attempt to elicit such testimony from Representatives Josephs and Manderino. While we find their testimony credible, we are disinclined to afford it any weight, as we believe that the Enrolled Bill Doctrine, while not precluding review of alleged mandatory constitutional violations on stipulated facts, weighs against the consideration of testimony relating to the state of mind of individual legislators involved in the passage thereof.

## VIII. DISCUSSION

The constitutional restrictions on the procedure for enacting legislation in this Commonwealth are founded on notions of fairness and public notice, and were intended to correct the abuses that abounded prior to the addition of these measures in 1874. These restrictions prohibit the practice of passing "Omnibus" bills, such as are common in the Congress of the United States, which encompass thousands of pages, diverse subjects, and are often Indecipherable by the average reader, and indeed by members of Congress themselves. One need only to look at these

**5.** Act of June 24, 1968, P.L. 237

procedures to see what the drafters of the 1874 constitution sought to prevent.

As noted by Judge Woodside

The General Assembly and its enactment of laws was substantially changed in the Constitution of 1874. Prior to that time, nearly 95% of the statutes passed were special or local acts doing such things as: granting divorces and annulments to specific couples, opening and closing an alley in a particular borough, changing the venue of a specific case, granting profit and non-profit corporations to individuals to operate banks and all kinds of associations, granting a right to operate the ferry at Millersburg, annexing a particular farm to a particular borough, appropriating a substantial sum of money to an individual for his raising troops during the Civil War.

The procedure not only opened the door to log rolling, [and] favoritism, … but made them a way of legislative life. Most of the evils which existed in the General Assembly of Pennsylvania and in the Congress of the United States were examined with the idea of correcting them in the new Constitution. The result is found in the required method of enacting legislation contained in Article III.

Woodside at 295.

The constitutional restrictions, however, although plainly expressed in the text of Article III, Section 3, do not lend themselves readily to bright-line rules, as the cases over the past century and a quarter have shown, and the line between what is constitutionally acceptable and what is not is often blurred. The procedure challenged in this case appears to have crossed that line.

■ Upon considering petitioners' request for preliminary injunctive relief the Court believes that petitioners have established a clear right to relief as to the alleged single subject violation. Moreover, although petitioners were unable to quantify the financial harm that might befall the City of Philadelphia through implementation of various provisions of Act 230, petitioners' testimony was not, as respondents assert, too speculative to establish immediate and irreparable harm. Both Mr. Vignola and Mayor Street testified unequivocally that the repeal of Section 209(k) of the PICA Act could ruin the City's 5–year plan. Two decades ago, President Judge Crumlish considered a request to preliminarily enjoin the City of Philadelphia from enforcing increased taxes under the "Non–Resident Cap" of the Tax Reform Code of 1971. *Leonard v. Thornburgh*, 75 Pa. Cmwlth. 553, 463 A.2d 77 (1983) (single-judge opinion by Crumlish, P.J.), later proceedings at 78 Pa.Cmwlth. 216, 467 A.2d 104 (1983) and 83 Pa.Cmwlth. 1, 477 A.2d 577 (1984), *rev'd on other grounds*, 507 Pa. 317, 489 A.2d 1349 (1985).

As part of the balancing of harms in the preliminary injunction proceedings, Judge Crumlish concluded that the injunction must be denied because the impact of granting an injunction upon the City's fiscal equilibrium would be disastrous. Judge Crumlish noted,

If this Court enjoins the collection of the current wage tax, a $60 million deficit would result, causing an unbalanced budged, and propel the City into a state of fiscal paralysis. An obvious crippling consequence of the City's inability to expend funds is the disruption, if not the termination, of vital municipal services, none the least of which is the police and fire protection, a frightening threat to the residents and non-residents. This Court will not so endanger the public

welfare and is not moved at this preliminary stage to so hold.

463 A.2d at 82.

Judge Crumlish's rationale applies equally here. While the testimony presented in this case does not suggest immediate, dire consequences of the type discussed by Judge Crumlish, it is obvious that the harm to the City goes well beyond speculation, and well beyond the mere loss of revenue. Accordingly, we find that petitioners have met their burden of showing immediate and irreparable harm should this Court fail to issue a preliminary injunction.

Notwithstanding this finding of irreparable harm, however, we must still look to the harm that might arise from the granting of such an injunction. Petitioners argue that Act 230 imposes major changes on several entities, including the Pennsylvania Convention Center Authority, the Philadelphia Parking Authority and the Pennsylvania Intergovernmental Cooperation Authority, all of which will affect the City's finances. While the City argues that these changes are ill-advised and will result in disastrous consequences, the sole legal challenge to the legislation is based on procedural Constitutional grounds. Put another way, absent a finding of procedural constitutional violations, there is and can be no argument that the legislature may not change the law, even if the changes made are "ill-advised" or detrimental to the parties affected: The City argues that the "uncertainty" surrounding the validity of the changes has and will continue to cause financial harm to the affected entities. This "uncertainty," however, arises from the City's decision to challenge the legislation in the first instance, and, there-fore, is largely self-inflicted. The City is correct, however, that should this Court decline to issue a preliminary injunction, but subsequently invalidate Act 230, such a decision would cause additional disruption that could be avoided by maintaining the status quo that existed prior to the enactment of Act 230. Conversely, respondents argue that many of Act 230's changes have already been implemented, and should not now be undone, only to be reinstituted in the future if Act 230 in fact survives the constitutional challenge.

This somewhat circular argument cannot be remedied, as any action or inaction by this Court at this stage does nothing to remove the "uncertainties" surrounding the status of Act 230. Nonetheless, we believe that our prior conclusions regarding the constitutionality of Act 230, as well as the evidence adduced at the hearing, lean strongly in favor of granting the requested preliminary injunctive relief.

We must next determine whether such preliminary relief may be tailored by enjoining only certain parts of Act 230. We conclude from the credible testimony of Joseph Vignola and Mayor John F. Street, as more fully set forth in our Conclusions of Law, that the remedy best tailored to this situation is a preliminary injunction of Act 230 in its entirety. We note that the Act does not contain a severability provision, and, while a narrower preliminary injunction might be crafted, such a step may well lead to more confusion and uncertainty that it would prevent. The alleged constitutional violation applies with equal force to the entire act, thereby suggesting that injunctive relief should not be granted piecemeal, but should also encompass the entire act.[6]

6. No party argued that any of the other provisions of Act 230 must be immediately implemented, or that any harm would arise from an injunction relating to them. We note that several portions of Act 230 do not take effect for 60 days, or March 1, 2003. These include

In conclusion, the Court is constrained to note that very little of the discussion or legal argument in this matter had to do with the interest of those who will be forced, in the end, to pay for all the additional costs, patronage, and litigation fees engendered by Act 230 of 2002—the taxpayers. Most of this legislation was concealed from the public until 24 hours prior to its passage. While some commentators have referred to similar types of bills as "stealth legislation" this Court does not wish to use that term as it would impute evil motives to the leadership of the General Assembly. The term "24 hour legislation" would seem to be more appropriate. However, it is exactly such "24 hour legislation" that the Constitutional amendments of 1874 were meant to prohibit. Unfortunately, the public had no indication that such radical changes in governance were being contemplated despite the fact that, as noted, the taxpayers will be footing the bill for all of this. Pennsylvania is one of the few states that has incorporated, via its constitution, restraints upon the Legislature's ability to propose and pass legislation without public notice. The foregoing scenario is exactly what the framers' of the 1875 Constitution meant to prevent.

## CONCLUSIONS OF LAW

1. Petitioners have established a clear right to relief as to the alleged violation of Article III, Section 3 of the Pennsylvania Constitution (single subject requirement).

2. Petitioners have established a clear right to relief as to the alleged violation of the title requirement of Article III, Section 3.

3. Petitioners have further established a clear right to relief as to the alleged violation of Article III, Section 4.

4. Petitioners have failed to establish a clear right to relief as to the alleged violation of Article III, Section 6.

5. The testimony of Joseph Vignola establishes immediate and irreparable harm to the Pennsylvania Intergovernmental Cooperation Authority and the City of Philadelphia stemming from the repeal of Section 209(k) of the PICA Act.

6. The testimony of Mayor John F. Street establishes immediate and Irreparable harm to the City of Philadelphia and its citizens stemming from the implementation of the various provisions of the Act relating to the Philadelphia Parking Authority and the Pennsylvania Convention Center Authority Act.

7. The granting of a preliminary injunction would cause no harm to the legislative and executive respondents, and any harm to respondents Pennsylvania Convention Center Authority and Philadelphia Parking Authority arising from the grant of a preliminary injunction would be temporary, and could be readily remedied in the event that Act 230 ultimately survives constitutional scrutiny.

8. The public interest lies in favor of maintaining the status quo ante pending a determination on the merits of this matter.

Accordingly, we enter the following OR-DER.

## ORDER

NOW, February 19, 2003, following hearing on petitioners' Motion for preliminary injunction, said Motion is GRANTED, and the implementation of Act 230 of 2002 is PRELIMINARILY ENJOINED. Said injunction shall not repudiate any acts taken under the authority of Act 230 prior to the time and date of this Order. The governing body of the Pennsylvania Con-

the provisions relating to the Philadelphia Parking Authority.

vention Center Authority shall be RE-CONSTITUTED as it existed immediately prior to the enactment of Act 230 pending further order of this Court, or, upon the passage of subsequent non-constitutionally infirm legislation, signed into law by the Governor, superseding Act 230 of 2002.

The governing body of the Pennsylvania Convention Center authority shall be re-constituted consisting of those current members that were authorized under the Convention Center Authority Act as it existed prior to Act 230.